LOUIS S. CHASE *vs.* NEW YORK CENTRAL AND HUDSON
· RIVER RAILROAD COMPANY. ·

LOUIS S. CHASE, administrator, *vs.* SAME.

SUMNER H. HANCOCK *vs.* SAME.

· IRVING H. PAGE *vs.* SAME.

ALICE J. PAGE *vs.* SAME.

Worcester.   January 10, 1911. — March 1, 1911.

Present : KNOWLTON, C. J., LORING, BRALEY, SHELDON, & RUGG, JJ.

*Negligence,* In use of automobile.  *Automobile.  Sale.  Corporation.  Evidence,*
Opinion, Best and secondary, Competency, Presumptions and burden of proof.  *Words,*
" Sold."

A person driving an automobile on a country road and approaching a grade crossing
of a railroad with the road, which has no gates or a flagman, is not in the exer-
cise of due care unless he looks and listens for approaching trains in a reasonable
way before attempting to cross the railroad, and the fact that he can stop near
the track for this purpose with greater convenience than can the driver of a
horse will be considered in passing upon the question of the reasonableness of
the way in which he looks and listens.

If the driver of an automobile, who is approaching an open grade crossing of a
railroad with the highway on which he is travelling, is perfectly familiar with
the crossing and knows that a train may come from either direction at any
moment, and with this knowledge drives his car within about fifteen feet of the
track before he perceives that a train is approaching on it and then attempts to
cross and is run over by the train, he is not in the exercise of due care, even if
he was running his car at the rate of only from twelve to fifteen miles an hour
until he was very close to the track when he reduced his speed to eight miles an
hour, and even if it is possible, although not probable, that the train was run-

ning faster than twenty-five miles an hour and that no bell was rung or whistle blown as the train approached the crossing.

Where a manufacturing corporation, which as a part of its business conducts an automobile department, transfers by a bill of sale to another corporation, newly organized by the officers and stockholders of the older corporation for the purpose of accepting such transfer and of carrying on the automobile business, such of its assets as belonged to such department in return for capital stock of the new corporation which at once is distributed among the stockholders of the older corporation as a stock dividend, the tranfer constitutes a sale of such assets, although there is no change in the location of the property transferred, and although a single person, acting in accordance with proper votes of the boards of directors of the respective corporations, on behalf of the older corporation delivers the bill of sale and receives for it the certificate of shares of capital stock of the new corporation, and on behalf of the new corporation receives the bill of sale and delivers therefor the certificate of shares of its capital stock, and although one provision of the bill of sale is that a settlement between the two corporations, as to what under certain of its provisions is due to or should be paid by the new corporation to the old on account of past business of the automobile department of the older corporation, is not to occur until a future time; and therefore in accordance with the requirements of St. 1903, c. 473, § 2, an automobile which was included in the assets so transferred and had been registered by the older corporation by a manufacturer's number, should be registered again by the new corporation, and any one using or riding in it upon the highway before it is again registered is using the highway unlawfully and cannot recover for injuries resulting from ordinary negligence of third persons.

Perhaps the word "sold," as used in St. 1903, c. 473, § 2, providing that, after registration in a certain way of an automobile or motor cycle by a manufacturer or dealer, the automobile or motor cycle "shall be regarded as registered" "until sold or let for hire or loaned for a period of more than five successive days," should be held to mean "sold and delivered," per KNOWLTON, C. J.

At the trial of an action in which a material question was the ownership of an automobile which the defendant contended had been sold by one corporation to a second, the plaintiff, who was the president of both corporations, in direct examination testified that the automobile belonged to the second corporation. In rebuttal, he testified that, after an examination of the books and papers of the corporation, he desired to change his testimony as to which corporation owned the automobile. All the books and papers which *determined the question were* in evidence and were undisputed, and, in the opinion of this court, showed that the automobile belonged to the second corporation. *Held,* that the testimony in rebuttal, being a mere expression of opinion, was not competent evidence on the question of the title to the automobile, when everything upon which the determination of that question depended was established by evidence from records and undisputed facts.

At the trial of an action in which a material question was, whether on a certain day one corporation had sold an automobile to another, all the books, papers and corporate records bearing upon the question were in evidence and were undisputed. The grantee corporation had been organized *to take over the* property and business of an automobile department of the grantor corporation, which manufactured firearms and machinery. The plaintiff was at the same time the president of both corporations. From the documentary evidence it appeared that a bill of sale of property including the automobile had been executed

by the plaintiff by authority of a vote of the board of directors of the grantor corporation and later had been approved and that stock had been issued there-for by the board of directors of the grantee corporation. There was a provision in the bill of sale giving the grantee corporation the rights of the grantor corporation in all accounts of its automobile department at the date of the sale and that the grantee corporation should assume all the debts of the business at that date, and a further provision that at a date later than that of the bill of sale an accounting should be had and the balance adjusted as between the corporations. The plaintiff testified that he handed the bill of sale to his bookkeeper and told him to keep it until the time when the accounting should be had and then to turn it over to the grantee corporation. *Held*, that such testimony was not competent to show that the contract of sale did not take effect when the shares of stock of the grantee corporation were issued and delivered for it.

It is at least doubtful whether action of the board of directors of a business corporation at a meeting, of which a record was kept, can be proved by oral evidence, per KNOWLTON, C. J.

At the trial of an action in which a material question was, whether on a certain day one corporation had sold an automobile to another, all the books, papers and corporate records bearing upon the question were in evidence and were undisputed. The grantee corporation had been organized to take over the property and business of an automobile department of the grantor corporation, which manufactured firearms and machinery. The plaintiff was at the same time the president of both corporations. From the documentary evidence it appeared that a bill of sale of property including the automobile had been executed by the plaintiff by authority of a vote of the board of directors of the grantor corporation and later had been approved and that stock had been issued therefor by the board of directors of the grantee corporation. There was a provision in the bill of sale giving the grantee corporation the rights of the grantor corporation in all accounts of its automobile department at the date of the sale and that the grantee corporation should assume all the debts of the business at that date, and a further provision that at a later date an accounting should be had and the balance adjusted as between the corporations. The recording officer of the board of directors of the grantee corporation testified that at the meeting of that board at which the bill of sale was approved and stock was authorized to be issued therefor, the plaintiff had said " that the bill of sale would be held by " the grantor corporation " until the " time for the accounting and "at that time the books would be balanced and the bill of sale turned over to the " grantee corporation, and that " the directors said that would be all right." There was a formal record of the meeting which contained no mention of such action. *Held*, that, aside from the question whether action of the board could be proved by oral evidence under the circumstances, the testimony had no tendency to prove that the title to the automobile had not passed before the date of accounting, and could only be interpreted as referring to the complete surrender of the books and papers when the balances had been made up on the books, as contemplated by the bill of sale, after the instrument had taken effect and the property had passed.

The statutes requiring signals to be given by locomotive engines approaching crossings at grade of railroads with public ways are intended only for the protection of persons who rightfully are upon the public ways.

A person driving or being transported upon a highway in an automobile which is not registered according to statutory requirements has not the rights of a traveller lawfully upon the public way.

KNOWLTON, C. J.    These are five actions to recover damages caused by a collision of an automobile in which the plaintiffs were riding, with a locomotive engine and a combination passenger and baggage car of the defendant, at a crossing of the highway by the railroad in East Brookfield, on August 21, 1906. The second of the actions is for the death of the first plaintiff's intestate, caused by this accident. Each of the others has counts at common law, as well as a count under the St. 1906, c. 463, Part II. § 245, founded upon the alleged neglect of the defendant to give the signals required by law at railroad crossings. A great variety of questions arose at the trial,* some of which it will not be necessary to decide. It was arranged with the judge, by agreement of counsel, that the five cases, with another brought by the Stevens-Duryea Company to recover damages for injury to the automobile, should be submitted to the jury, and that if verdicts for the defendant were returned in any of the cases the findings of the jury should be final. If they should find for the plaintiff in any of the cases, the verdicts were to be set aside, and the cases reported to this court upon the question whether the judge was justified as a matter of law in submitting them to the jury. If he was not, judgments were to be entered for the defendant. If the cases were rightly submitted, judgments were to be entered for the plaintiffs upon the verdicts, subject to certain stipulations as to possible motions for a new trial on the ground of excessive damages, which are not now material.

The question before us is whether, upon such of the evidence as is material and competent, the cases could properly be submitted to the jury. Ordinarily the first inquiry upon such a report is whether there was evidence of negligence of the defendant or its servants. The accident happened at a crossing of the branch of the defendant's railroad that runs four miles from East Brookfield to North Brookfield. The highway at that point runs nearly east and west and the railroad nearly north and south, although the two roads at the crossing are not exactly at right angles, the larger angle between them being at the right of the plaintiffs as they approached the crossing, which was the direction from which the train came, and the smaller angle being at their left. The plaintiffs were going westward

---

* Before *Sanderson,* J.

on their way from Boston to Chicopee Falls. The accident happened at about twelve o'clock, on a bright day in August. The plaintiffs were riding in an automobile of fifty horse power, weighing about thirty-seven hundred and fifty pounds when empty, designed to carry seven passengers, and capable of going at a speed of sixty miles an hour when carrying five persons. Hancock, who was running the automobile, was a chauffeur of large experience, who has driven automobiles in different races, and who drove one of this kind a mile, in one race, at a speed of seventy miles an hour. He was familiar with this crossing, having driven over it many times in each direction. The plaintiffs Irving H. Page and Alice J. Page had been over it a considerable number of times, and had observed it in passing. Neither the other plaintiff nor his wife, the intestate, had ever passed over it.

The country for a considerable distance on the highway and along the railroad is nearly level. The ordinary sign on the highway to warn travellers of the danger of the crossing was maintained, and the plank on the crossing, cattle guards at the sides, and other objects, showed plainly that this was a railroad crossing. The highway was a dirt road, hard, in good condition and descending at a very slight grade in the approach to the crossing from the east. From most points on the way, for a considerable distance east of the crossing, a train approaching from the north could be plainly seen, although there were points where the view would be obstructed by houses, trees or shrubbery. An engineer, who presented a plan made from a survey, testified to the distances from the crossing up the track, northward, that a person standing in the middle of the railroad could be seen from points in the middle of the highway at different distances from the middle of the crossing. From a point ten feet east of the crossing one can see up the track eight hundred and thirty-three feet; from a point twenty feet east, seven hundred and thirteen feet; from a point thirty feet east, six hundred and thirteen feet; from a point forty feet east four hundred and thirty-three feet, and so on, with gradually diminishing distances from points at intervals of ten feet of additional distance eastward, until, from a point one hundred and seventy-five feet east, one can see up the track only one hundred and

eighteen feet. The crossing is in a country town, but there is quite a large amount of travel over it. The trains over this branch road are very few.

Plainly the corporation itself could not be found to be negligent in maintaining this crossing at grade, on a country road, with the sign and other appointments described in the testimony. It was within the authority of the statute. There had been no requirement by the railroad commissioners under the provisions of the R. L. c. 111, § 192, that gates, or a flagman, or an electric signal, should be maintained there, and the conditions shown in the evidence were not such as would warrant the jury in finding negligence on the part of the corporation in failing to provide such appointments voluntarily. *Hubbard* v. *Boston & Albany Railroad*, 162 Mass. 132, 135. *Commonwealth* v. *Boston & Worcester Railroad*, 101 Mass. 201.

The only negligence on the part of the defendant's servants for which there is a possible ground of contention was in running the train too rapidly, or in failing to give the statutory signals required at crossings. As to the first, it appeared that there are no stopping places between North Brookfield and East Brookfield. The running time is ten minutes for the four miles. There were numerous witnesses who testified as to the speed of the train at the time of the accident, no one of whom estimated it at more than twenty-five miles an hour. The weight of the evidence tended to show that the train was running at from twenty to twenty-five miles an hour. The only evidence upon which the plaintiffs rely, as tending to show that it was going faster than this, is the testimony of the engineer, who was asked in cross-examination as to the rate at which he was running in different parts of his course. He gave estimates of miles per hour, from which the plaintiffs' counsel compute the time spent in going his first mile as two minutes and thirty seconds, the time for the second mile as two minutes and twenty-four seconds, and the time for the third mile as two minutes and twenty-five seconds, making an aggregate for the three miles of seven minutes and nineteen seconds. He testified that the distance from North Brookfield to the crossing is three and one half miles, and that the train left North Brookfield at seven minutes before twelve o'clock, and he gave the time of the accident as

one minute past twelve o'clock, as nearly as he could judge. Upon these estimates and computations there were but forty-one seconds in which to run the last half mile before the accident, from which it is contended that the train was then running at the rate of forty-four miles an hour. Another witness testified that he heard the whistle and the crash of the accident, and he judged that there was an interval of twenty seconds between them. A speed of eighty rods in twenty seconds would be at the rate of forty-five miles an hour. Treating these figures as exactly correct, which were given only as general estimates both of time and speed, and substracting the aggregate of estimated time for each of the first three miles from another time thought to be about the time of the accident, and a number of seconds is obtained to represent the time of running the last part of the course, which would indicate a speed greater than twenty-five miles an hour. It is plain that running at the rate of twenty-five miles an hour is not evidence of negligence. It is also plain that, if such a computation in seconds, founded only upon uncertain estimates made from judgment and memory, long afterwards, has any tendency to show that the train was then running faster than twenty-five miles an hour, it is hardly more than a scintilla of evidence to set against the other testimony in the case.

The testimony relied on to sustain the plaintiffs' contention that the defendant's servants were negligent in not ringing the bell and blowing the whistle is not more convincing. The witnesses who were in the automobile testified that they heard no bell or whistle and saw and heard nothing of the approaching train until it was right upon them. Twenty-four witnesses testified positively that they heard the whistle blown in the usual way as the train approached the crossing. Ten witnesses testified with equal positiveness to hearing the ringing of the bell. Several of these testified that it rang all the way from the signal post to the crossing, and several that they could not tell whether it was ringing all the way from the whistling post or only a part of the way. Not one of the witnesses who testified on this subject, other than the persons in the automobile, said anything which under the decisions could be received as evidence that the bell did not ring. *Menard* v. *Boston & Maine Railroad*, 150

Mass. 386, 387. *Slattery* v. *New York, New Haven, & Hartford Railroad,* 203 Mass. 453, 457, and cases cited. One of them testified : "I do not remember about the bell. I used to hear the bell and the whistle. I never minded them : I never minded the bell. I used to hear the whistle." Another said : "I heard the whistle. It was the usual sound of the whistle given by the train. I do not know as I can remember about the bell." Others testified in a similar way. No one of those who failed to hear the bell was shown to be in such a position, or to be giving such attention, that his failure to notice it was any evidence that it did not ring.

It would seem as if the same could be said of the four persons who were in the tonneau of the automobile. According to the testimony, they were engaged in conversation, telling stories and the like, and no one of them was giving any attention to the fact that they were approaching a crossing, or to the possibility of hearing a signal from a locomotive engine.

But, according to the testimony of Hancock, this cannot be said of him. He says he was giving attention to the place and the possible dangers. Under the decisions, his failure to hear the bell or whistle would be competent evidence tending to show that they were not sounded. Whether, in a case where the burden of proof was on him to establish the proposition that the whistle was not blown, a verdict in his favor could be permitted to stand against the testimony of twenty-four credible witnesses who said that they heard it, or whether it would be the duty of the judge to set aside such a verdict *toties quoties,* upon application, is a question that we need not decide. Upon this point too, there is little, if any, more than a mere scintilla of evidence that there was neglect to give the statutory signals.

Upon such counts submitted to the jury as required proof that Hancock, in running the machine, was in the exercise of due care, we think it plain that there was no evidence for their consideration. Upon his testimony at this trial, he was running this car at the rate of from twelve to fifteen miles an hour until he was very close to the track, when he reduced his speed to eight miles an hour. There was other testimony that he was running very fast. At the inquest which was held soon after the accident, he testified that he was going about fifteen miles

an hour approaching the crossing, and slowed up to about twelve miles an hour before the accident.   A witness who talked with him on the day of the accident, inquiring how it happened, testified : " I asked him if he was going so fast he could not stop and he said, ' I was not running that car over twenty miles an hour.' " According to his testimony and that of the other witnesses in the car, neither he nor any of the others had any knowledge of the approaching train until they were within about fifteen feet of the track.   He was perfectly familiar with the crossing and supposed that a train might come from either direction at any moment.

The rules of law applicable to the driver of a horse drawn vehicle approaching a railroad crossing have been laid down in many cases.   He must look and listen in a reasonable way, so as, if possible, to secure his safety.   The proper application of this rule for one driving an automobile is simple, and in concrete cases far less difficult than for the driver of horses.   As was said in *Hubbard* v. *Boston & Albany Railroad,* 162 Mass. 132, 136, " There are very few horses that can safely be stopped within fifteen or twenty feet of a railroad track to await the passage of an express train.   One driving there before the accident was obliged to choose between the risk of driving across and being struck by an express train whose approach he might fail to hear, and the risk of stopping to look so near the track as to expose him to great danger from the fright of his horse if an approaching train would be near."   The driver of an automobile is in no such danger.   If his machine is a good one, it can be controlled easily and perfectly, and there is no danger from it if he stops to look and listen within six feet of the track.   The difference between automobiles and vehicles drawn by horses, in the application of the rule, has been recognized by the courts. In *New York Central & Hudson River Railroad* v. *Maidment,* 168 Fed. Rep. 21, the court said : " He cannot drive close to the track, or stop there, without risk of his horse frightening, shying, or overturning his vehicle. . . . These precautions the automobile driver can take, carefully and deliberately, and without the nervousness communicated by a frightened horse.   It will thus be seen an automobile driver has the opportunity, if the situation is one of uncertainty, to settle that uncertainty on the

side of safety, with less inconvenience, no danger, and more surely than the driver of a horse. Such being the case, the law, both from the standpoint of his own safety and the menace his machine is to the safety of others, should, in meeting these new conditions, rigidly hold the automobile driver *to* such reasonable care and precaution as go to his own safety and that of the travelling public. If the law demands such care, and those crossing make such care, and not chance, their protection, the possibilities of automobile crossing accidents will be minimized." To the same purport is *Brommer* v. *Pennsylvania Railroad,* 179 Fed. Rep. 577. See also *Spencer* v. *New York Central & Hudson River Railroad,* 123 App. Div. (N. Y.) 789, affirmed in 197 N. Y. 507. With the statement of the law in the paragraph above quoted we entirely agree. With proper care on the part of the driver, there is no danger in crossing a railroad with an automobile upon an ordinary highway in a country town. In this case, considering that part of the testimony which is most favorable to the plaintiffs, there is no evidence that Hancock was in the exercise of due care ; but, on the contrary, the accident seems to have been caused by his great carelessness.

We will not consider whether there was evidence that the other plaintiffs, or any of them, were personally in the exercise of care, or whether any or all of them were in such relations to Hancock as to be affected by his negligence, within the rules stated in *Shultz* v. *Old Colony Street Railway,* 193 Mass. 309, and later cases.

There are undisputed facts which, in our opinion, are decisive of the cases. The automobile, up to the time of its completion or until about that time, belonged to the J. Stevens Arms and Tool Company, which was a manufacturer of fire arms, machines and other tools, and also of automobiles. The business of manufacturing and selling automobiles was conducted in a separate department called the automobile department. The pattern of automobile manufactured was called the Stevens-Duryea automobile, and this department of the business, during the last part of the time of carrying it on by this corporation, was sometimes called the Stevens-Duryea Company. Early in the year 1906 the officers and members of the J. Stevens Arms and Tool Company formed a plan to organize a corporation, to be called

the Stevens-Duryea Company, to take over the property and business of the automobile department of the J. Stevens Arms and Tool Company.   On May 18, 1906, a majority of the directors of this corporation applied to the secretary of the Commonwealth for a certificate of incorporation for a new company to be known as the Stevens-Duryea Company, to have a capital stock of $300,000, made up of three thousand shares, of a par value of $100 each.   Its authorized business was to be the manufacture and sale of automobiles, with a right to do other things which we need not mention.   On May 18, 1906, a certificate of incorporation was duly issued in accordance with the application, containing a provision that the three thousand shares of capital stock should be paid for, to the amount of one thousand shares in personal property and machinery, and to the amount of two thousand shares in merchandise.   The J. Stevens Arms and Tool Company had a license numbered 064, issued under the authority of the St. 1903, c. 473, § 2,* as a generally distinguishing number or mark; which operated as a registration of automobiles and motor cycles owned or controlled by it, until

---

* The sections of the statute referred to are as follows:

"Section 2.  Every manufacturer of or dealer in automobiles or motor cycles may, instead of registering each automobile or motor cycle owned or controlled by him, make application upon a blank provided by said commission for a general distinguishing number or mark, and said commission may, if satisfied of the facts stated in said application, grant said application, and issue to the applicant a certificate of registration containing the name, place of residence and address of the applicant, and the general distinguishing number or mark assigned to him, and made in such form and containing such further provisions as said commission may determine; and all automobiles and motor cycles owned or controlled by such manufacturer or dealer shall, until sold or let for hire or loaned for a period of more than five successive days, be regarded as registered under such general distinguishing number or mark.   The fee for every such license shall be ten dollars."

"Section 5.  Except as hereinafter provided, no person shall, on or after the first day of September in the year nineteen hundred and three, operate an automobile or motor cycle upon any public highway or private way laid out under authority of statute unless licensed so to do under the provisions of this act.   No person shall operate an automobile or motor cycle for hire, unless specially licensed by the commission so to do.   No person shall employ for hire as chauffeur or operator of an automobile or motor cycle any person not specially licensed as aforesaid, and every chauffeur or operator for hire shall, while so acting, display the distinguishing number or mark assigned to him, in such manner as may be prescribed by the commission."

sold or let for hire, or lent for a period of more than five successive days. The automobile in which the plaintiffs were riding bore the number 064, and was being used under this general registration number of the J. Stevens Arms and Tool Company at the time of the accident. Its registration, by the terms of the statute, ceased when it was sold. The defendant contended at the trial that it was sold to the Stevens-Duryea Company before the accident, and was therefore unregistered, and was being used in violation of the St. 1903, c. 473, § 5.*

On July 6, 1906, a meeting of the directors of the Stevens-Duryea · company was held, at which the following vote was passed: "Voted: that the property offered by the J. Stevens Arms & Tool Company and J. Frank Duryea in exchange for three thousand shares of common stock of this company appears to be reasonably worth the value of said stock and to be necessary for the purposes of the company. The same is hereby accepted in full payment for said shares of stock, and the proper officers of this company are hereby authorized and directed to receive duly executed bills of assignment, bills of sale, etc., of said property, and to issue in exchange, therefor, three thousand shares of the capital stock of this company to said J. Stevens Arms and Tool Company and J. Frank Duryea in proportion of two-thirds to said company and one-third to said Duryea, or to persons designated by them." On August 17, 1906, a meeting of the directors of the J. Stevens Arms and Tool Company was held, at which the bill of sale was read, a copy of which is included in the record of the meeting, running from this corporation to the Stevens-Duryea Company, purporting to sell and convey to the latter corporation, for a " consideration of one dollar and the other considerations hereinafter expressed," the receipt of which is acknowledged, all the property belonging to its automobile business, all of which is more fully described in a schedule annexed. It is admitted that the automobile used at the time of the accident was a part of this property. In the bill of sale were these provisions: "And whereas, for sometime past, and prior to the organization of the grantee corporation and in contemplation thereof, the said business of manufacturing automobiles has been kept by the grantor, as far as practicable,

* See footnote on previous page.

separated from its other business, and has been known and called, sometimes the ' Automobile department,' and sometimes ' Stevens-Duryea Company,' and separate books of account have been kept showing not only the dealings on account of said automobile department with third persons, but also its accounts with the grantor corporation, which said books include a sales ledger, purchase ledger, cash book and journal, — all said accounts, books, bills, etc., are included in this conveyance, and the said grantee shall have full power to sue and collect the same either in its own name or in the name of the grantor, but at the expense of the grantee, and all accounts and liabilities due from and properly charged to said automobile department or said Stevens-Duryea Company heretofore, shall be assumed and paid by the grantee as a part of the consideration hereof.

" And it is further agreed that at or before the time of the taking of the next inventory of the grantee, the accounts heretofore existing between the grantor and its automobile department, designated as Stevens-Duryea Company, as shown by said books of account or otherwise, shall be balanced, and any indebtedness found to be due from said grantor to said department shall be paid to the grantee, and as a part of the consideration hereof, the grantee agrees to pay to the grantor any balance found to be due to it from said department.  To have and to hold all and singular the said goods and chattels to the said Stevens-Duryea Company, and its successors and assigns to their own use and behoof forever. . . . The consideration of this conveyance, in addition to that above stated, is the transfer to the grantor of two thousand shares of the capital stock of the grantee, said two thousand shares being two-thirds of its entire capital stock."

The instrument contained covenants of title and warranty, and ended with a formal clause, reciting the signing of the name of the corporation and the affixing of its corporate seal by Irving H. Page its president and treasurer, on the seventeenth day of August, 1906.  It had also at the end the words " Signed, sealed and delivered in presence of."  The record of the meeting shows that, after the reading, the following votes were passed:

" Voted, that whereas it is deemed for the best interest of this company that the Automobile Department of the business, here-

tofore conducted by this company under the terms of a certain contract between it and J. Frank Duryea, should be established on an independent basis, and whereas a new corporation called the Stevens-Duryea Company has been formed for that purpose; that Irving H. Page, President and Treasurer, be and he is hereby authorized and instructed to execute in the name and behalf of the corporation the bill of sale which has been read, and to deliver the same to the proper officer of the grantee upon transfer to said grantee by said Duryea of all his interests, patent rights, etc., and upon receipt of two thousand shares of the capital stock issued by the Stevens-Duryea Company to persons designated by said Irving H. Page.

" Voted, that upon the sale and delivery of certain property of this corporation to the Stevens-Duryea Company and upon the acceptance by the treasurer in exchange therefor of certificates representing two thousand shares of the capital stock of the said Stevens-Duryea Company, the treasurer is hereby authorized and directed to transfer the entire two thousand shares of the said stock of the Stevens-Duryea Company to the stockholders of record in this corporation as and for a dividend, said stock to be issued to the stockholders of this company in proportion to their several holdings of its stock, and in the following amounts." Then follow the names of four stockholders, with the number of shares to be transferred to each, making two thousand shares in all.

This bill of sale was then signed, in the name of the corporation, by I. H. Page, president and treasurer, and the clause of attestation above quoted was signed by two witnesses. A meeting of the directors of the Stevens-Duryea Company was held on the same day an hour and a half later, and the record shows that the " bills of sale and assignments from the J. Stevens Arms and Tool Company and Mr. J. Frank Duryea to the Stevens-Duryea Company, were read and their form approved." The following votes were passed:

" Voted: that in accordance with the vote passed at the last meeting, the bills of sale and assignments which have just been read be accepted upon the conditions therein stated and that the entire three thousand shares of the capital stock of this company be issued in exchange therefor as follows: Two thou-

sand shares to J. Stevens Arms and Tool Company. One thousand shares to Mr. J. Frank Duryea.

"Voted: that the sum of forty-five thousand dollars be, and the same is hereby appropriated for the payment of a dividend of fifteen dollars per share of the entire capital stock payable to stockholders of record at the close of this meeting."

On the same day all of the capital stock of the Stevens-Duryea Company was issued, being one certificate of two thousand shares issued to the J. Stevens Arms and Tool Company, bearing date August 17, 1906, signed by I. H. Page, President, and I. H. Page, Treasurer, which was receipted for on the 17th day of August, 1906, signed by the "J. Stevens Arms and Tool Company, by I. H. Page, Treasurer." Immediately after its issuance a writing was made upon the back of the certificate, assigning different numbers of the shares of the stock represented by it to the different members of the corporation, the J. Stevens Arms and Tool Company, in accordance with the distribution previously voted as a dividend. The remainder of the stock of the Stevens-Duryea Company was issued to J. Frank Duryea, in a certificate of one thousand shares, signed by I. H. Page, President, and I. H. Page, Treasurer, and receipted for on August 17 by Duryea. J. Frank Duryea assigned this certificate so as to divide the shares, giving some to other persons, and retaining some for himself. On this same day new certificates were issued to all the persons who were to receive the stock under the assignments and distribution provided for, all of which bore date August 17, and all of which were receipted for on the same day by the other persons to whom the certificates were issued. One of these certificates was issued to I. H. Page, and was receipted for by him. He was the president and treasurer of each of these corporations. These were the only votes or acts of either of the boards of directors touching the transfer of the property that appear in the case. Do they show a contract that took effect on August 17, or was there nothing but negotiations at that time, which did not ripen into a contract until long afterwards?

If there was any contract at all, it was that set out in the bill of sale, and it passed the title to the property described in the writing. There was nothing that bound either party until that

contract took effect. Nothing else in the form of a contract was referred to in their dealings with each other. We are of opinion that, upon the undisputed facts, the contract became binding when the Stevens-Duryea Company accepted the bill of sale which was offered to it in the meeting of its directors, and complied with the conditions on which it was to take effect. The records show previous negotiations. The vote of the directors of this corporation on July 6 shows that the other corporation had previously offered the property for the stock, and the vote is an acceptance of the offer, and a direction to the proper officers of the company to receive the bills of assignment, bills of sale, etc., and to issue the three thousand shares of stock in exchange for them. This shows an agreement of the two corporations upon the terms of the contract, and an arrangement for the completion of the formal contract later. Then, on August 17, the formal bill of sale having been prepared and read to the directors, there is a vote instructing the president and treasurer of the selling corporation to execute it and deliver it to the proper officer of the grantee, upon a transfer to the grantee of certain rights by Duryea, and upon the receipt of two thousand shares of its capital stock. Thereupon the president and treasurer executed the bill of sale, and took it to the meeting of the other corporation, held later on the same day. The record shows that the bills of sale and assignments from Duryea, together with this bill of sale, were there read and approved, and a vote was taken that they be accepted upon the conditions therein stated, and the capital stock be issued in exchange therefor. The capital stock was then issued by the purchasing corporation, and accepted by the selling corporation and by Duryea. The bill of sale was in the hands of Page, the president and treasurer of the selling corporation, who took it to the meeting under a vote of instruction to deliver it. It remained in the hands of the same person, who was also the president and treasurer of the purchasing corporation which had accepted it by vote and paid for it. The instrument was offered on one side and accepted on the other. The consideration was paid on one side and accepted on the other. Under these circumstances there was no need of a formal transfer of the paper from the right hand to the left hand of the person who was at the same time the president and treasurer of both

corporations.   When that was done on both sides which was prescribed and intended to give the contract effect, it took effect. All this appears by the writing and the records.   The writing shows that no formal delivery, or change of place of any of the articles of property was ever contemplated, and no such change was ever made in connection with the transfer.   By the terms of the instrument the stock was to be given for the property. According to the terms of the instrument the stock was given for the property, and was accepted as taken in exchange for it. Moreover, the directors of the Stevens-Duryea Company, including Page, knew that the stock could not lawfully be issued except as paid for by the property.   Two at least of the directors of the J. Stevens Arms and Tool Company also knew this fact, for they were at the same time directors of the Stevens-Duryea Company.   The above recited facts, that took place on August 17, constitute a complete execution of the contract on both sides, excepting the ascertainment of the balances to be paid and accounted for, and the passing over of the books of account, which by the terms of the bill of sale were to be done after the title to the property had passed, " at or before the time of the taking of the next inventory of the grantee."   The grantee neither had nor could have any property to inventory until after this contract had taken effect.   The dividend of the purchasing company, voted on August 17, was paid to the stockholders by checks on August 27, and the J. Stevens Arms and Tool Company furnished the money for the purpose.

The oral testimony relied on by the plaintiffs cannot change the result which follows, as matter of law, upon the proper interpretation of the records.   The plaintiff, I. H. Page, testified that the automobile belonged to the Stevens-Duryea Company at the time of the accident, meaning the corporation of that name. After the plaintiffs' case had been closed and the defendant had opened its defense showing its reliance upon the failure of that company to obtain registration of the automobile, he went to his place of business at Chicopee Falls, with two of his attorneys, and with them examined the books and papers of the corporation, and after his return he testified in rebuttal that he wished to change his former testimony as to the ownership of the automobile.   Referring to the time of this examination of the books,

on a Saturday during the trial, he testified: "It was at that time I discovered that the change in the concern did not take place until September 1, 1906." In cross-examination he said: "From the time that the suit was brought in the name of the Stevens-Duryea Company until I took this stand last Monday, I thought that the Stevens-Duryea Company owned that automobile. . . . And I thought so when I was on the stand that day." His change of opinion seems to have come from a misinterpretation of the books and papers of the corporation in connection with an extended examination of them, made during the trial, after the plaintiffs had rested their cases. Every fact appearing in the transaction of the business and in the books and papers in evidence is consistent with a purpose to make up and balance the accounts, after the property had passed, in accordance with the terms of the bill of sale, at some convenient time either before or at the time of the making of its inventory by the purchasing corporation. The name of the purchaser was the same as that which the J. Stevens Arms and Tool Company had used to a considerable extent in conducting that department of its business. The business, seemingly, was to be carried on by the same persons and in the same way after the change in proprietorship as before. The interests of individuals represented in the business were nearly, although not exactly the same after the purchase as before. By the terms of the bill of sale the new corporation was to have the benefit of all old accounts afterwards collected, and in the subsequent accounting was to assume and pay all old bills then unpaid, just as it would receive and pay moneys in the business to be done after the accounts had been balanced. The fact that the parties made up their accounts and struck their balances as of September first, instead of August 17, has no tendency to show that the contract did not take effect and the property pass on August 17. The rights of the parties were fixed on that day, although the balances on the one side and the other would depend upon the collections and payments and the state of the accounts on the books up to the time of balancing. The pecuniary result to both parties would be the same, whether the accounts were made up on August 17 or on September 1.

The statement of Page in his testimony in rebuttal, that the

car belonged to the J. Stevens Arms and Tool Company at the time of the accident, is nothing more than his opinion, and it is not competent evidence to prove title when everything upon which the title depends is established by evidence from records and undisputed facts.

The testimony that Page handed the bill of sale to his book-keeper, Leonard, and told him to hold it until September 1, when the inventory was taken, and then turn it over to the Stevens-Duryea Company, is not competent as evidence to show that the contract did not take effect.   What had taken place between the two corporations gave the instrument effect, and it was then in Page's hands as evidence of a completed contract, held by him as president and treasurer of the purchasing corporation, for its benefit, as well as for the benefit of the selling corporation, in reference to the liability upon the accounts. So far as a technical delivery was important, what had previously occurred constituted a delivery, and Page had no authority to do anything that would deprive the purchasing corporation of the benefit of its contract.   When the paper was afterwards in the hands of the bookkeeper he held it by Page's direction, and under his control.   In legal effect, it was in Page's hands as an officer of the corporation.

The testimony of Remington was not competent, unless to show action of the board of directors.   He said: " Mr. Page told the directors at that meeting [the meeting of the purchasing company on August 17] that the bill of sale would be held by the J. Stevens Arms and Tool Company until after the inventory was taken, which would be August 31, and at that time the books would be balanced and the bill of sale turned over to the Stevens-Duryea Company. . . . The directors said that would be all right."   The records show that the directors held formal meetings, of which records were kept.   Remington, who was the recording officer, made no record of such consent by the board.   The by-laws of the corporation are not before us; but it is at least very doubtful whether the action of the board, at a meeting of which a record was kept, can be proved by parol.   If the evidence was competent, it had no tendency to show that the title did not pass.   The inventory referred to was that mentioned in the bill of sale, and that was to be an inven-

tory of the grantee as owner. In view of all that passed between the parties, this remark can only be interpreted as referring to the complete surrender of the books and papers when the balances had been made up on the books, as contemplated by the bill of sale, after the instrument had taken effect and the property had passed.

By the terms of the statute the registration of the selling corporation was effective only until the automobile was sold. St. 1903, c. 473, § 2. Perhaps the word "sold" as here used should be held to mean sold and delivered. In the present case we have no occasion to consider this; for the possession and control of all the property passed on August 17. This registration could not afterwards cover the automobile unless it again came into the ownership or control of the selling corporation.

In *Dudley* v. *Northampton Street Railway*, 202 Mass. 443, and in *Feeley* v. *Melrose*, 205 Mass. 329, it was held that a person riding upon a highway in an unregistered automobile cannot recover for an injury caused by the negligent conduct of another traveller. In *Doherty* v. *Ayer*, 197 Mass. 241, a similar doctrine was stated in reference to a plaintiff claiming damages caused by a defect in a highway. The plaintiffs contend that 'the principle is not applicable to the claims in these actions, founded on the statute requiring a bell to be rung or a whistle sounded for the protection of travellers at railroad crossings. St. 1906, c. 463, Part II. §§ 245, 147. It was held in *Dudley* v. *Northampton Street Railway*, *ubi supra*, that the St. 1903, c. 473, §§ 1–3, was intended to outlaw unregistered machines, "and to give them, as to persons lawfully using the highways, no other right than that of being exempt from reckless, wanton or wilful injury." It is said that "the Legislature intended to put these forbidden and dangerous machines outside the pale of travellers." There is no doubt that the purpose of the legislation as to signals at railroad crossings was to protect travellers on the ways. The section relates only to signals from the engine when approaching a way or travelled place. Section 245; above referred to, was originally enacted as St. 1871, c. 352, under the title, "An Act for the better protection of travellers at railroad crossings." Although the language of the body of the act does not limit the liability to persons using a way as travellers, we

are of opinion that the general purpose of the statute and the language of its title call for a construction that makes it inapplicable to persons upon a crossing for purposes other than travel. This is in accordance with the construction given, in different cases, to the statute requiring the erection of fences along the sides of a railroad. *Menut* v. *Boston & Maine Railroad,* 207 Mass. 12. *Eames* v. *Salem & Lowell Railroad,* 98 Mass. 560. *McDonnell* v. *Pittsfield & North Adams Railroad,* 115 Mass. 564. *Darling* v. *Boston & Albany Railroad,* 121 Mass. 118. Under this construction the plaintiffs cannot avail themselves of this statute, for, under the cases above cited, persons riding upon the streets in an unregistered automobile have not the rights of travellers.

If we consider the particular provisions of the statute, we reach the same result. A person cannot have the benefit of the statute if he is acting in violation of law and his unlawful act contributes to the injury. St. 1906, c. 463, Part II. § 245. Hancock, in operating an automobile that was not registered, was acting in violation of law. Neither he nor the others in the automobile, of whose persons he had charge in running the machine, can recover under the statute, if his unlawful act contributed to the injury. Under the early decisions in this Commonwealth, it is too plain for argument that such unlawful conduct would preclude recovery. Under later decisions, the distinction between unlawful conduct which is a cause of an injury and that which is a mere condition of it has been thoroughly established in the law of this Commonwealth. *Newcomb* v. *Boston Protective Department,* 146 Mass. 596. *Black* v. *New York, New Haven, & Hartford Railroad,* 193 Mass. 448. *Farrell* v. *B. F. Sturtevant Co.* 194 Mass. 431, 434. In many other States, in determining whether an unlawful act is a direct and proximate cause of an injury, the tendency of the decisions is towards the establishment of the doctrine that, if there is an unlawful element in an act, which in a broad sense may be said to make the act unlawful, this will not preclude recovery unless the unlawful element or quality of the act contributed to the injury, so that, if the act of a plaintiff may be considered apart from a certain unlawful quality that may enter into it, and if so considered there is nothing in it to preclude recovery, the existence

of the unlawful quality is of no consequence unless in some way it had a tendency to cause the injury. It would not be easy to reconcile all the decisions in this Commonwealth. Some of the later ones, while not attempting to point out exactly the line of distinction, seem to be nearly in harmony with this doctrine, as it is sometimes stated elsewhere.

But if it should be held that a violation of the law as to the use of sleigh bells by a traveller would not preclude him from recovery under this statute, so long as such an unlawful element in his conduct did not contribute to the injury, or in case of a like holding if there was a violation of the law of the road by turning to the left instead of to the right in meeting another team by a traveller, when about to cross a railroad, (see *Spofford* v. *Harlow*, 3 Allen, 176; *Hall* v. *Ripley*, 119 Mass. 135) it does not follow that plaintiffs can recover in cases like these. While, in the cases just supposed, it might be held that the unlawful part of the conduct, taken by itself, was not a cause of the injury, and that the act might be considered apart from the unlawful element in it which had no direct connection with the injury, it is not so in the present cases. Under the decisions, the operation of the unregistered automobile is deemed to be unlawful in every feature and aspect of it. Everything in the conduct of the operator that enters into the propulsion of the vehicle is under the ban of the law. In going along the way and entering upon the crossing the machine is an outlaw. The operator, in running it there and thus bringing it into collision with the locomotive engine, is guilty of conduct which is permeated in every part by his disobedience of the law, and which directly contributes to the injury by bringing the machine into collision with the engine. He is within the words of the statute. He is in no better condition to recover than a person would be who was violating the law by walking on the track of a railroad, and was struck by an engine when he had reached the crossing of a highway. Every minute of the time, and in every part of his movement, while walking upon the track in his approach to the crossing, he would be a violator of law and a trespasser. His unlawful act, in walking to that point and thus coming into collision with the engine, would directly contribute to his injury, and would preclude him from recovery.

The judge was right in setting aside the verdicts. The use of the unregistered automobile requires the entry of a judgment for the defendant in each case.

*Judgments for the defendant.*

*W. Thayer & A. T. Smith,* (*C. W. Bartlett* with them,) for the plaintiffs.

*R. A. Stewart,* (*H. J. Hunt* with him,) for the defendant.