# Louisville & Nashville Railroad Company v. Treanor's Administrator.

(Decided February 19, 1918.)

## Appeal from Shelby Circuit Court.

1. Railroads—Crossings—Automobile Driver—Care to be Exercised by at Grade Crossings.—The driver of an automobile in approaching a railroad grade crossing is required to exercise such care as may be usually expected of an ordinarily prudent person to learn of the approach of a train and keep out of its way, and if the crossing is dangerous he is required to exercise increased care commensurate with the danger; but he is not required to stop before going on the track.

2. Railroads—Crossings—Duty of Railroad Company.—Railroad trains in approaching a public crossing are required to give the statutory crossing signal, and if the crossing is dangerous, to take such other means to warn travelers of their approach as may be considered necessary by prudent persons operating trains.

3. Railroads—Crossings—Stop, Look and Listen Rule—Automobiles.—The stop, look and listen rule has never been adopted in this state and the driver of an automobile is only required to exercise the same care in approaching a grade crossing as the driver of other vehicles.

4. Railroads—Crossings—Conflict in Evidence as to Care—Question for Jury.—Where there is conflict in the evidence as to whose negligence caused an injury at a grade crossing, the question is for the jury under proper instructions.

5. Railroads—Crossings—Obstructions Placed by Railroad Company That Interfere With View of Track—When Negligence.—Where a railroad company put on each side of a grade crossing a bank of dirt taken from nearby ditches, and on top of these erected plank fences that obstructed the view of the track from a highway traveler, this was such negligence on the part of the company as to put on it the exercise of a high degree of care in approaching the crossing

6. Railroads—Crossings—Dangerous Grade Crossing—Instructions Defining Care to be Exercised by Railroad Company and Highway Traveler.—The instructions given by the trial court defining the duty of the railroad company and the highway traveler at dangerous grade crossings are approved.

BENJAMIN D. WARFIELD and WILLIS, TODD & BOND for appellant.

BEARD & PICKETT and RALPH GILBERT for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

Frank Treanor, while driving a heavy automobile truck of the Standard Oil Co., was killed at a public road grade crossing when the engine of a passenger train of the railroad company struck the truck at the crossing. On a trial of the case there was a verdict and judgment accordingly against the railroad company for ten thousand dollars, and it prosecutes this appeal.

The principal ground relied on for reversal is that Treanor did not take reasonable or sufficient precautions for his own safety in attempting to cross the track and so being guilty of such contributory negligence as would defeat a recovery, there should have been, as requested, a directed verdict in favor of the railroad company.

Other alleged errors committed by the trial court in the introduction and rejection of evidence, as well as in giving and refusing instructions, are also presented, but, as stated, the chief question in the case relates to the precautions the driver of an automobile should take for his own safety when and before he is about to cross a railroad track at a grade crossing. Before, however, taking up these questions, we will state so much of the evidence as develops the circumstances and conditions surrounding the accident and the place where it occurred.

Frank Treanor, who all the witnesses say was a sober, prudent, industrious and intelligent man, was and had been for some years employed by the Standard Oil Co. as its agent at Shelbyville, Ky., for the sale and delivery of its oil and other products. In delivering the articles kept for sale to different customers throughout Shelby county, he used an automobile truck that weighed between six and eight thousand pounds on which he carried in cans the oils, gasoline and other things that the Standard Oil Co. sold at this agency. This automobile had a seat in front large enough to accommodate a driver and another person, and on the day he was killed L. F. Rush, an intelligent, sober and prudent young man, was riding with him on the seat in the front of the automobile, Treanor being at the wh

In the afternoon of August 5, 1916, the day of the accident, Treanor, who was out in the truck delivering goods, left Christiansburg, a station of the railroad company, on his way to Croppers, another station about three miles west of Christiansburg. Between Christiansburg and Croppers the single track of the railroad company is crossed at grade by one of the public turnpike roads of

Shelby county. This road, at and near this crossing, was in a populous section of the county and the travel on it by vehicles of all kinds, including automobiles, was heavy.

On his way towards the crossing Treanor stopped for a few minutes about two hundred feet from the track for the purpose of delivering some oil to a customer at the side of the road, and then drove on towards the track.

The railroad ran in a deep cut for several hundred feet on each side of this crossing, and the turnpike road also ran in a cut for a distance of about 180 feet from the railroad, the turnpike cut terminating at the railroad right of way about 20 feet from the track. Extending from a ditch, which was near to and alongside the railroad track, to the face or side of the cut, the railroad company had thrown up on each side of the turnpike a bank of dirt about three feet high taken from the ditch, and on top of these piles of dirt, from a point very close to the track to the top of the railroad cut, the company had built on each side of the turnpike a plank fence about five feet high, with planks about ten inches wide, and with spaces of three inches between the planks. So that a traveler on the turnpike going in the direction Treanor was would enter a cut about 180 feet from the track, getting deeper as he approached the track, until a depth of about eight feet was reached at the railroad right of way line a few feet from the track. This cut would obstruct from his view an approaching train until he reached the railroad cut on the line of its right of way and, when he got to it, his view would be further obstructed by the banks of dirt that the company had put on its right of way from the track to the face of its cut and by the plank fences that it had built on top of these banks of dirt.

As the railroad also ran in a deep cut, the two cuts and banks of dirt and fences would likewise prevent the engineer and fireman from seeing an approaching vehicle until it had virtually gotten on the track, and so it will be seen that it would be difficult to find anywhere in the country a more dangerous grade crossing than this one.

After leaving the point where Treanor had delivered the oil, and while approaching the track, Rush, whose escape from death was little short of miraculous, described what happened as follows:

"Q. Where were you intending to go? A. To Cropper, I think. Q. Did you have another stop to make there? A. I think so. Q. What was the nature or grade of the road, from the point where the oil was delivered at your last stop, down to the railroad tracks? A. Slightly down grade. Q. I will ask you whether or not, after you left that last stop at the oil tank, going towards the turnpike crossing, the view was cut off from a train approaching from the direction of Louisville? A. Yes, sir. Q. What, if anything, obstructed that view? A. Bank on that side. Q. On the side of the turnpike? A. Yes, sir; side of the turnpike. Q. For what distance back from the turnpike and the railroad crossing would you say that view was cut off? A. I can't say; I don't know. Q. You don't know? A. Yes, sir. Q. As you and Mr. Treanor approached this turnpike crossing, where it crossed the tracks of the Louisville & Nashville R. R. Co., was the attention of either one of you called to the fact that you were approaching a railroad crossing? A. He remarked to me that was the most dangerous crossing in the county. Q. Did he say why? A. He said, 'You can't see the track either way.' Q. I will ask you whether or not you observed that yourself? A. Yes, sir. Q. Well, what, if anything, did he do as he approached the crossing? A. Why, he was going rather slow, and he slowed down still further. Q. I will ask you if there was any attempt made by either you or him to observe the approach of the train to the crossing? A. I was looking myself forward and listening; he seemed to be doing the same. Q. How close did you get to the railroad crossing before you observed the train approaching? A. We were almost on the track. Q. Could you say in feet how many feet you were from the railroad crossing—from the railroad track? A. Well, I don't know how many feet we were; I know we were almost on the track itself. Q. Almost on the rail, you mean? A. Yes, sir. Q. How far was the train at that time, would you say, Mr. Rush? A. I don't know just exactly how far off it was; not a very great distance, though. Q. Say in feet about how many, the best you can estimate. A. I will have to make a guess at it, Mr. Beard. Q. Your best judgment is what we want, Mr. Rush. A. I would say thirty yards; I don't know whether it was that far or farther. Q. Something about thirty yards? A. Yes, sir. Q. How fast did the train seem to be approaching?

A. Well, it seemed to be coming fast; I don't know just how fast. Q. Could you estimate in miles about how fast it was coming? A. No, sir; I wouldn't know how to estimate it; I know it was coming very fast from the distance it went on before it stopped.

"Q. Did the cars of the Louisville & Nashville R. R. Co. strike the truck? A. I didn't see them strike. Q. Did you hear it? A. Yes, sir; I heard the crash. Q. You were in the car at the time? A. Yes, sir. Q. How did you make your escape, get out? A. I jumped out of the truck across the track. Q. From the truck? A. From the truck. Q. You were sitting on the front seat of the truck, I believe? A. Yes, sir; there is only one seat on it. Q. Which side were you sitting on? A. On the left-hand side. Q. The drive wheel is on the right? A. Yes, sir. Q. Mr. Treanor handled the wheel, I believe? A. Yes, sir. Q. How far did you jump? A. I don't know; I cleared the track; I went across the track; I don't know how much farther I went. Q. How did you light? A. On my feet. Q. Did you fall after lighting on your feet? A. No, sir. Q. I will ask you whether or not Mr, Treanor at the time made any effort to make his escape? A. All I remember of him doing was to reach down for a lever on his right-hand side; I suppose it was the brake. Q. Reached down on his right-hand side? A. Yes, sir. Q. Was that the last movement you saw him make? A. Yes, sir."

The engineer, after testifying that he gave the usual and statutory signals for the crossing at the whistling post, some 1,600 feet west of the crossing, said that a moment or two afterwards the fireman said "Look out," which he understood to mean there was danger, and he immediately gave three or four short blasts of the whistle and applied the emergency brakes; that he did not see the truck at all before it was struck, as it was approaching the track on the fireman's side of the engine; that he was running behind time at a speed of about thirty-five miles an hour.

The fireman, after saying that the road crossing signals were sounded at the proper place and that the bell was ringing from there to the crossing, said that when he first saw the automobile truck coming down the road it was about six or eight feet from the track and he would judge running something like ten miles an hour; that the engine was about twenty or thirty feet away from the

crossing at the time he discovered the presence of the truck.

When the engine, which was going in the direction of Christiansburg from Croppers, struck the front end of the automobile, which when hit was on the track, Treanor was instantly killed, the automobile being practically demolished and some slight damage done to the locomotive engine.

Between this grade crossing and Croppers and at the distance from the crossing prescribed by the statute, the company had a whistling post, and there is much conflict in the evidence as to whether this train gave at or near this whistling post the crossing signals required by the statute. Numerically, the weight of the evidence shows that the crossing signals were given, but there is other evidence, by several persons who were qualified by their nearness to the place to speak on the subject, that they were not given, and so we may safely say that the evidence on the issue as to whether the crossing signals were sounded was so conflicting as to authorize the submission of the question to a jury; and upon this issue we may further say there was sufficient evidence to authorize the jury in finding that the crossing signals were not given; or, at any rate, their finding upon this issue could not be considered so flagrantly against the evidence as to justify us in ordering a new trial on this ground.

It also appears that Treanor had traveled this turnpike road frequently and it is clear from the statements he made to Rush as they approached the track that he knew how dangerous the crossing was, and it is a reasonable presumption that Treanor, who was a careful, prudent man and knew he was near the crossing, was listening for train signals and keeping a lookout for the approach of trains. It must also, as we think, be conceded that neither Treanor nor Rush, although they were giving attention, heard any crossing signals or saw the approaching train until the automobile was on the track. To say otherwise would be to imply that both of them were intent on suicide or else guilty of reckless negligence, and there is not the slightest intimation in the record that would warrant us in assuming that either of these conditions existed.

Assuming now that both Treanor and Rush were exercising ordinary care commensurate with the danger to discover the approach of trains and keep out of their

way the question is, was this measure of care sufficient, or should they have stopped the ,automobile when very near to but before reaching the track and also looked and listened for approaching trains? It is of course apparent that if this high degree of care had been taken, the accident would not have occurred, and this is the degree of care counsel for the railroad company insist should have been taken. If this position is sound, it necessarily follows that the court should have taken the case from the jury, because there is no dispute about the fact that this degree of care was not·exercised.

We may also take it not to be seriously disputed by counsel for the railroad company that the evidence shows that Treanor exercised such care as the driver of an ordinary vehicle, a wagon or buggy, would be required to exercise, and that if he had been driving in a wagon or buggy the evidence on the subject of the care exercised by Treanor, coupled with the evidence that the statutory crossing signals were not given by the engine crew, would have been sufficient to take the case to the jury and authorize a verdict against the railroad company. It will, therefore, be seen that the precise question directly before us is, must the driver of an automobile when approaching a grade crossing stop and look and listen for approaching trains before crossing in order to be free from such contributory negligence as would defeat a recovery?

In some jurisdictions, and long before the introduction of the automobile, the courts put upon the highway traveler in a vehicle the duty to "stop, look and listen" before crossing a railroad track at a grade crossing, and of course when the automobile came into popular use as a vehicle for both freight and passenger traffic, the same rule theretofore applied to other vehicles was applied to automobiles. There was no difference in the application of the rule, but only in the new reasons advanced why it should be more strictly observed by drivers of automobiles than by drivers of other vehicles.

Thus in Callery v. Morgan's Louisiana Railroad, 139 La. 763, the court, in applying this rule in an action by the owner of an automobile to recover damages in a case where the automobile was struck by a train at a grade crossing, said: "The rule that one who reaches a railway crossing on a public highway is under the duty to stop, look and listen has been recognized and enforced

by this court in numerous cases, and it has been properly held, we think, that the law exacts from the driver of an automobile the strict performance of stop, look and listen before driving upon a railroad crossing where the view is obstructed." And, continuing, the court said that although the trainmen were guilty of negligence in failing to give the required crossing signals, the contributory negligence of the driver of the automobile in failing to stop, look and listen defeated his right to recovery.

In California the rule of stop, look and listen is applicable to all travelers, and in Thompson v. Southern Pacific Co., 31 Cal. App. 567, the driver of an automobile was denied the right to recover damages in a collision case because he failed to observe at a grade crossing this rule, although there was evidence tending to show that the train did not give warning of its approach to the crossing and that the driver of the automobile observed care in every respect except that he did not stop before crossing the track. To the same effect is Griffin v. San Pedro, L. A. & S. L. Railroad Co., 170 Cal. 172, L. R. A. 1916A, page 842.

In Massachusetts the rule of look and listen is also applied to all vehicles, and in Chase v. New York Central & H. R. Railroad Co., 208 Mass. 137, 94 N. E. 377, this rule was extended so as to require drivers of automobiles to stop as well as look and listen before crossing a railroad track at grade, and the failure to do these things was held sufficient to bar recovery, although the railroad company was negligent in failing to give the crossing signals.

In Virginia the rule as to all vehicles is "That the duty of looking and listening for an approaching train before crossing a railroad track must be discharged in a way to make looking or listening effectual," and the court in Washington & O. D. Ry. Co. v. Zell's Admx., 118 Va. 755, extended this rule in respect to automobiles so as to put on the driver the additional duty of stopping before crossing the track.

In New York C. & H. R. R. Co. v. Maidment, 168 Fed. 21, 21 L. R. A. (N. S.) 794, the United States circuit court held that "The duty of an automobile driver approaching tracks where there is restricted vision to stop, look, and listen, and to do so at a time and place where stopping and where looking and where listening will be effective, is a positive duty."

In that case the driver of the automobile stopped about twenty feet from the track for the purpose of discovering approaching trains, and not seeing any, proceeded on his journey, but, the court went so far as to say that although the driver of the automobile stopped and looked and listened when within fifteen or twenty feet of the track, this was not sufficient care on his part and he should have gone closer to the track so that when he stopped he would have a clear view of it. To the same effect is Brommer v. Pennsylvania R. R. Co., 179 Fed. 577, 29 L. R. A. (N. S.) 924.

In Wehe v. Atchison, T. & S. F. R. Co., 97 Kan. 794, L. R. A. 1916E, page 455, the court held, quoting the head note made by the court, that "The driver of an automobile cannot recover damages for injuries to himself or his machine where he approaches a railway track at a place at which he cannot see along the track until his automobile is in a place where it will be struck by a passing engine or cars, and does not stop his car to ascertain whether or not there is danger, although he listens before going into the place of danger and does not hear any engine or cars coming."

These cases sufficiently illustrate the rule contended for by counsel for the railroad company, and if this rule should be applied it is clear that Treanor's failure to bring his automobile to a stop before reaching the railroad track was such negligence as would defeat a recovery in this case, because, according to the doctrine laid down in the cases referred to, the fact that he was careful and that he looked and listened for the approach of trains, and the further fact that the railroad company, as there was evidence to show, was guilty of negligence in failing to give the crossing signals would not take the case to the jury.

Other courts, however, have not seen proper to put on drivers of automobiles the high degree of care at grade crossings exacted in the opinions referred to. Thus in Walters. v. Chicago, M. & P. S. R. Co., 47 Mont. 501, 46 L. R. A. (N. S.) 702, it appears from the opinion that Walters, as he approached the crossing where the automobile in which he was riding was struck by a train, was exercising care to discover the approach of trains, although he did not stop his machine. There was also evidence tending to show that the crossing signals were not given by the engine crew. In that case, as in this, it

was a dangerous crossing, due to the fact that the highway approached the track in a cut and the railroad track ran in a cut.

In that case on behalf of the railway company the contention was made, as it is here, that his failure to stop and look and listen was such negligence as would defeat a recovery, and in support of this proposition reliance was had on the Maidment, Brommer and other cases referred to, but in respect to this the court said:

"If such were the law, a person approaching a railroad track would either be obliged to keep a constant lookout in both directions, or it would be incumbent upon him, in order to avoid the imputation of contributory negligence, to stop, if necessary, and look for a train at the last available point, and at the last moment of time, befor crossing the track. The law is that one desiring to cross a railroad track must exercise reasonable care for his own safety. We see no reason to change these rules either for or against any class of vehicles in lawful use."

In Texas Pacific Ry. Co. v. Hilgartner (Tex. Civ. App.), 149 S. W. 1091, the court in declining to adopt the stop, look and listen rule in automobile cases said:

"The courts of this State have uniformly held that it would be error for a court to charge that it is the duty of one approaching a railroad crossing to stop, look and listen, and we know of no reason why this rule should be changed because one is approaching in an automobile. Even if such were his duty, it would still have been improper for the court to have assumed as a matter of law that such failure was contributory negligence which so directly contributed to the accident as to defeat a recovery."

In Kellogg & Co. v. L. & N. R. R. Co., 164 Ky. 531, Kellogg brought suit against the railroad company to recover damages sustained by his automobile truck when it was struck by one of the trains of the railroad company at a grade crossing. In that case the court told the jury that it was the duty of the truck driver to use such care in approaching the railroad crossing as persons of ordinary prudence would usually exercise under similar circumstances to learn of the approach of trains and to keep out of their way, and that if they believed from the evidence that the driver failed to exercise such care and that but for the failure the collision would not have occurred, they should find for the defendant.

It is proper, however, to say that in that case the jury found a verdict for the railroad company, which was affirmed on the appeal, and the question here raised was not presented in the record or in the argument of counsel for the railroad company.

In Louisville & Interurban R. R. Co. v. Morgan, 174 Ky. 633, we find a case presenting a question quite analagous to the one now under consideration, although on the facts it cannot be said to be directly in point. In that case an automobile was struck at a private crossing by one of the electric cars of the interurban company, and it was insisted that the driver was negligent in failing to sound his horn before going on the track. In discussing in a general way the duty of the driver of an automobile in crossing railroad tracks, the court said:

"The rule in this State is that contributory negligence such as, without which the injury would not have been received, bars a recovery, and in the instructions to the jury in such cases the courts have not established any other rule for an automobilist, who is suing a railroad for damages to his automobile, than is applied to the owner of a wagon, threshing machine or other vehicle, whose owner undertakes to cross a railroad track with it and is struck by a train being operated upon the track. If one with a traction engine proposes to cross a railroad track, the jury is not told that it becomes the duty of the owner of the engine to sound a whistle from it, nor is the owner of a wagon or other vehicle required before crossing a railroad track to shout or to sound a horn as a warning to the ones operating the cars upon the railroad tracks. The duty ordinarily required of one about to cross a railroad track, if he would escape contributing to his own injury by negligence, is to exercise ordinary care to discover the approach of a car and to avoid being struck by it, and to so use and move his own vehicle as to avoid colliding with the car upon the railroad track. The care required of him is such care as an ordinarily prudent person would exercise under similar circumstances. The same standard of care applies to every one who undertakes to cross a railroad track, whether he is upon horseback, on foot, or occupying a wagon or automobile. The danger of the crossing, the inability to observe because of natural obstructions, the qualities of the horse driven or the automobile in use, the failure to sound a horn or to look for the train, and many other circum-

stances are proper subjects for consideration in determining whether the traveler has or has not exercised ordinary care, but these are matters to be considered and passed upon by the jury in determining whether the traveler has or has not exercised ordinary care, under the circumstances, to look out for the car and keep out of its way. . . . . .

"The further contention, that it is the duty of the driver of an automobile, before entering upon a railroad crossing to stop, to look and to listen for a train which might be approaching, has never been adopted in this jurisdiction, nor has the rule been applied to the driver of any kind of a vehicle as a hard and fast rule of law."

The general rule in this State, as approved without deviation in numbers of opinions, puts on railroad companies in approaching ordinary grade crossings the duty of keeping a lookout and giving the statutory signals, and on the highway traveler the duty of exercising ordinary care to discover the approach of trains, and, also, when the crossing is dangerous, as was this one, then increasing care commensurate with the danger is imposed on both the railroad and the traveler and this duty was correctly set forth as to both in instructions telling the jury:

"It was the duty of the employes of the defendant railroad company, in charge of its engine, in approaching the turnpike crossing described in the petition and evidence, to sound the whistle or ring the bell at a point not less than fifty rods north of the crossing, and to sound the whistle or ring the bell continuously or alternately from that point to the crossing, and if the jury believe from the evidence that this crossing was over a much-traveled thoroughfare, and because of its location and surroundings unusually dangerous to travelers and that the sounding of the whistle and ringing of the bell was not sufficient to give reasonable notice of the approach of the train to the crossing and the defendant knew this, or by the exercise of ordinary care could have known it, then it was the further duty of the defendant and its servants in charge of the train at the time to use such other means to prevent injury to travelers at said crossing as in the exercise of ordinary judgment might be considered necessary by ordinarily prudent persons operating a train, and if the jury believe from the evidence that the defendant and its employes in charge of

its train at the time it struck and killed the decedent, Treanor, failed to ring the bell or sound the whistle as herein set out, or to provide other methods to warn the traveling public of its approach to said crossing, if the jury believe the facts of this case required of the defendant and its servants in charge of its engine, in the exercise of ordinary care, to employ other means of warning of the approach, and as a direct result of such negligence, if any, on the part of the defendant and its servants, the decedent, Treanor, was killed, then the law is for the plaintiff and the jury should so find, unless they believe as in instruction No. A.''

And that ''It was the duty of the decedent, Treanor, on approaching the crossing to use such care as may be usually expected of an ordinarily prudent person to learn of the approach of the train and keep out of its way, and if the crossing was especially dangerous and he knew it, it was incumbent upon him to exercise increased care commensurate with the danger, and if he failed to exercise such care, and but for this would not have been injured, then the law is for the defendant and the jury should so find, even though they may believe from the evidence that the defendant or its employes were negligent as set out in instruction No. 1.'' C. & O. Ry. Co. v. Gunter, 21 Ky. L. Rep. 1803; L. & N. R. R. Co. v. Lucas' Admr., 30 Ky. L. Rep. 359; C. & O. Ry. Co. v. Hall's Admr., 147 Ky. 12; L. & N. R. R. Co. v. Parks' Admr., 154 Ky. 269.

Returning now to consider the stop, look and listen rule that has never been in force in this state, but which we have time and again been urged in behalf of railroad companies to adopt as the legal measure of care to be observed by all highway travelers on horseback and in horse-drawn vehicles, we will endeavor to set forth the reasons that persuade us not to make a rule for travelers in automobiles different from that applied to travelers on horseback or in horse-drawn vehicles.

By way of preliminary it may be said that all courts agree that the exclusive use of highway crossings is not in the railroad company, as both it and the highway traveler have reciprocal rights and duties to perform at these places. The higher duty, however, is with the railroad company on account of the great harm its trains are capable of doing as compared with ordinary vehicles, whether motor or otherwise; and that there should be a

distinction between the care to be exercised by train crews and the care to be exercised by travelers on the highway is emphasized and made plain by the statute which requires crossing signals to be given by trains, while there is no statutory duty put on the traveler. Both the highway traveler and the railroad company have rights in the use of these crossings that each must respect and that neither can disregard without being guilty of negligence. If the engine crew fails to give the crossing signals required by the statute, then the railroad company is guilty of negligence; and if the highway traveler fails to exercise, at the usual type of crossings, such care as a person of ordinary prudence would to discover the presence of trains and to keep out of their way, and at dangerous crossings, the increased care demanded, he is likewise guilty of negligence.

We have never held, however, that the traveler was under no duty to stop, or to stop, look and listen. We have simply ruled that his failure to stop would not, as a matter of law, debar his right to recover damages. As said in C., N. O. & T. P. Ry. Co. v. Champ, 31 Ky. L. Rep. 1054: "In the numerous cases involving crossing accidents that have come before this court, the central idea in all of them is that the company must use such care and precautions for the safety of travelers as the character of the crossing makes reasonably necessary for their safety and protection. What this degree of care is, must depend upon the facts of each case, and is a question for the jury. At one crossing, ringing the bell and sounding the whistle might be amply sufficient; at another, it would be wholly inadequate, and a flagman or other safety device would be necessary. This does not necessarily mean that the speed of trains must be slackened, as no rate of speed at ordinary crossings is usually negligence, but at exceptionally dangerous crossings, if the company does not choose to have a flagman or other safety device, and the statutory signals are not sufficient, the speed of the train must be so regulated as not to unnecessarily imperil the safety of persons using the highway. The duty of observing such degree of care as the situation and surroundings of the crossings may reasonably demand to prevent accidents is not alone imposed on the company, but applies as well to the traveler, who must use such care as might usually be expected of an ordinarily prudent person, to learn of the approach of the

train and keep out of its way. In short, the obligations to avoid injury and accident are reciprocal and must be commensurate with the danger.'' To the same effect is Louisville & Nashville R. R. Co. v. Allnutt, 150 Ky. 831.

Now, when the traveler has exercised such care as a person of ordinary prudence would exercise, considering all the surrounding conditions, to learn of the approach of trains and keep out of their way, this measure of care is, we think, sufficient to meet all reasonable requirements. It is true this rule does not prescribe any specific thing the traveler must do, but it puts on him the duty of doing everything that a person of ordinary prudence would think it necessary to do for his own safety. This is the usual and generally approved standard of care that the common sense of the law demands that men shall observe when they are under a duty to exercise care in the regulation of their own conduct, and is as great as the average person should be expected to observe.

It follows from this that if a highway traveler, who, in the estimation of the jury, has exercised the required care, is struck and injured by a train, the crew of which have not observed the required care, he may recover damages for their negligence. On the other hand, if the train crew have observed the required care, and the highway traveler is hurt by his own negligence, then he must suffer the consequences of his want of care.

The fault we find in the rule laid down in the Maidment and other cases is that they take no account of the negligence of the railroad company and put the whole burden of care on the highway traveler. In other words, they hold that although the railroad company may negligently fail to give the crossing signals required by statute for the protection of the highway traveler, it should be exonerated from all blame, but that if the traveler, who has the reasonable right to depend on these signals and who, after listening and looking, or listening where he cannot look, does not hear any and accordingly has the right to assume that there is no train nearby, goes on the track and is injured, without having first stopped, as well as looked and listened, his negligence in these respects will debar him from recovering damages for the injury, although it might plainly be made to appear that he would not have been injured if the crossing signals had been sounded.

It is argued, however, that as the automobile is a heavy and powerful machine, a higher degree of care should be observed at grade crossings by the driver than in the case of the ordinary horse-drawn vehicle not only for the safety of the occupants of the automobile, but for the safety of the train and its passengers, and much weight is attached to this view in the Maidment case, *supra,* where it is said: "With the coming into use of the automobile, new questions as to reciprocal rights and duties of the public and that vehicle have arisen and will continue to arise. At no place are those relations more important than at the grade crossings of railroads. The main consideration hitherto with reference to such crossings has been the danger to those crossing. A ponderous, swiftly moving locomotive followed by a heavy train is subjected to slight danger by a crossing foot passenger, or a span of horses and a vehicle; but, when the passing vehicle is a ponderous steel structure, it threatens not only the safety of its own occupants, but also those on the colliding train. And, when to the perfect control of such a machine is added the factor of high speed, the temptation to dash over a track at terrific speed makes the automobile, unless carefully controlled, a new and grave element of crossing danger. On the other hand, when properly controlled, this powerful machine possesses capabilities contributing to safety. . . . It will thus be seen an automobile driver has the oportunity, if the situation is one of uncertainty, to settle that uncertainty on the side of safety, with less inconvenience, no danger, and more surely, than the driver of a horse. Such being the case, the law, both from the standpoint of his own safety and the menace his machine is to the safety of others, should, in meeting these new conditions, rigidly hold the automobile driver to such reasonable care and precautions as go to his own safety and that of the traveling public. If the law demands such care, and those crossings make such care, and not chance, their protection, the possibilities of automobile crossing accidents will be minimized."

But we do not think the fact that the automobile is capable of inflicting more harm than the ordinary vehicle is sufficient to require at crossings the application of a rule different from that applied to heavy wagons or vehicles. It is a matter of common knowledge that when a collision occurs between an automobile and an engine,

the result is the same as when the engine strikes a wagon, buggy or other ordinary vehicle—the occupants of the automobile or vehicle are the ones who are crippled or killed and not the passengers on the train or its employes.

Of course, under the rule of the Maidment case there would never be a crossing accident if the highway traveler should always stop before going on the track and look and listen from a point where he could see it in both directions. But this care the highway traveler will not always observe and hence the necessity for care by both parties entitled to the use of the crossing. To the thoughtlessness or negligence of highway travelers is due a majority of the crossing accidents, and it is in recognition of this carelessness or thoughtlessness on the part of the traveling public and to save them from its consequences, that the law has imposed upon railroad companies the duty of giving signals of the approach of their trains, so that the attention of the heedless traveler may be sharply called to the danger ahead of him.

When two persons have reciprocal rights, although in different degrees, at a certain place, and reciprocal duties to perform in the exercise of these rights, we cannot appreciate or understand the soundness or fairness of a rule that would exonerate one of the parties from all liability for his failure to observe the duty he was under and at the same time put on the other party the burden of observing rigidly the measure of duty he was under. We think our rule a much better one, because it treats both parties alike. It puts on both the observance of certain duties and the consequences on that one who fails to observe the duty.

As said in Louisville & Nashville R. R. Co. v. Miller, 134 Ky. 716: "A person who is about to cross the track is not required to assume that the railroad company will neglect its duty, and that the customary precautions for the safety of the public will not be taken. When these precautions are omitted, and a person who relied on the presumption that the track was safe is hurt, the primary negligence is on the part of the railroad company, and it should not be exonerated where he exercised such care as may be reasonably expected of an ordinarily prudent person under the circumstances. If no warning is given, a person will sometimes walk on a railroad track before he is conscious that he is near it. Though exercising ordinary care, he may at times be misled by appearances.

So it is that for the protection of life at those places where the presence of persons on or about the track is to be anticipated those operating trains and engines are required to give reasonable warning of their approach. . . . . The whole burden is not to be placed on the traveler. But, when he is led to believe the way is clear by the conduct of the railroad company, he may recover if he exercises ordinary care; and this, like other questions, depending on a number of circumstances, varying in importance according to their relation to other facts, is ordinarily a question for the jury.''

Another rule we have adopted in this class of cases, and which we think fair to both parties, is that when there is conflict in the evidence as to whose negligence or want of care caused the injury, this question of fact should be submitted, under proper instructions, to a jury, and when a properly instructed jury have determined this question of fact, we will not disturb their finding, unless it is flagrantly against the weight of the evidence. Take this case as an example of the operation of our rule. The railroad company said: ''We gave the crossing signals and observed all the care required of us, while Treanor thoughtlessly or negligently failed to exercise the degree of care he was required to exercise, and so his death was due to his own negligence.'' On the other hand, Treanor's administratrix said: ''Treanor did not fail to observe reasonable care, but you, the railroad company, failed to give the crossing signals, and his death was due to your negligence.'' And these issues, which involved purely questions of fact, were, under our practice, for the jury, and they found, as they had the right to do under the evidence, that the railroad company was negligent in failing to give the signals, and that Treanor exercised the care required by the instructions. They may also have believed that the ordinary statutory signals were given, but that these were not sufficient considering the dangerous character of the crossing, and also that Treanor exercised a higher degree of care than is usually demanded; but, however this may be, the question as to the respective negligence of the parties was for the jury, and the failure of Treanor to stop did not authorize the court to take the case from the jury.

As we have heretofore said, there is no fault in the instructions, but in deference to the insistence of counsel that they are in conflict with what was said in L. & N.

R. R. v. Breeden's Admx., 111 Ky. 729, we will briefly point out the difference between the instructions here in question and the instructions condemned in the Breeden case, which also involves a dangerous grade crossing.

The instructions in that case, as said in the opinion, "authorized the jury to find for the plaintiff if the crossing was a dangerous one on account of the cut, and should not have been given." But there was no such direction in the instructions given in this case. On the contrary, the trial court followed the law as laid down in the Lucas case and there is no conflict between that case and the Breeden case.

We may also here observe that while the company is not to be held negligent on account of the character of the cuts in either the railroad or the county road, we think it was negligent in putting the embankments between its track and the face of the cut, and in putting on top of these embankments the kind of fence it built there. It could have built a wire fence through which trains could be seen, and could have thrown the dirt from its ditch some place else, or piled it up so as not to obstruct a view of the track from the road. This crossing was dangerous enough on account of the cuts alone, but it was made much more so by these embankments and the fences which cut off almost completely a view of the track on either side of the crossing for a distance of probably twenty feet from the track. Indeed, we see little difference if any between obstructing a view of the track in the way it was obstructed by the banks and fences and in letting it become obstructed by weeds, briars or underbrush growing on the right of way, and we may also say that it is very probable that except for this obstruction the collision would not have happened.

It is also complained that the company was not advised by the instructions as to the precautions to be used by it in aproaching this crossing. A sufficient answer to this is that the railroad company could not avoid knowing that this was a very dangerous crossing, and it also knew better than any one else what extra precautions to take to lessen the danger.

There is some suggestion that error was committed in allowing evidence as to the speed of the train and as to certain repairs of the turnpike near this crossing by the county, but there is no merit in either of these contentions.

The judgment is affirmed.