# Louisville & Nashville Railroad Company v. Crockett's Administratrix.

(Decided February 4, 1930.)

ASHBY M. WARREN and TYE, SILER, GILLIS & SILER for appellant.

R. L. POPE and C. B. UPTON for appellee.

OPINION OF THE COURT BY COMMISSIONER STANLEY—Reversing.

Appellee's intestate, Earl Crockett, was killed at a railroad grade crossing on July 21, 1928, and because of his death judgment in the sum of $6,000 has been recovered against the appellant.

The place of accident is about 4 miles south of Williamsburg, and is known as the "Hog Jaw" crossing, taking its name from a small coal mine at that point. The Dixie Highway, south of the crossing, parallels and is contiguous to the railroad for about 2,000 feet. At a point 350 or 400 feet from the crossing the road dips, so that for that distance it is 15 or 20 feet below the railroad tracks. The highway rises sharply and crosses the railroad at an angle of about 45 degrees. The appellee's evidence was to the effect that one driving along the highway in this swag could not see an approaching train going in the same direction without looking through the rear window, because of the elevation of the tracks and the roof of the car. It is further proved that the habitual presence of coal cars at and near the crossing obstructed the view of approaching trains as a traveler came upon it, and therefore that this should be considered an extraordinarily dangerous crossing, requiring the higher degree of care on the part of the railroad company with respect to operating its trains at that place. Cf. Louisville & N. Railroad Co. v. Locker's Adm'r, 182 Ky. 578, 206 S. W. 780.

On the other hand, the railroad company proved that a train going north, the same direction that the decedent was traveling, could be seen for a distance of 2,000 feet or more. It was shown that 500 feet south of the crossing the state highway commission had erected a conspicuous sign, showing the near aproach to a railroad crossing, and at the crossing had erected a sign reading "Stop—Kentucky Law." In addition, the railroad company had its usual crossing sign at that place.

The company also proved that coal cars were seldom placed south of the crossing.

On the afternoon of the accident, according to the evidence of appellee, there were two gondola cars on a siding south of the highway crossing and about 15 feet therefrom. According to appellant, there was only one car, and it was about 30 feet from the crossing. North of the crossing there was another gondola car at or under a coal tipple, so travelers passed between these cars just before crossing the main track.

The deceased and two other young men were in a Ford coupe going north towards Williamsburg. It appears that as they approached the crossing they were talking and singing, but as they reached the foot of the incline they almost stopped or did stop the car momentarily, during the process of shifting into low gear. The deceased was riding on the right hand or side of the automobile nearest the track, Harry Smith was in the center, and Ralph Bowlin, about 16 years old, was driving the car, by and with the consent of the deceased, to whom it belonged. Bowlin testified that they were driving slowly, and before crossing the railroad he looked and listened for a train; that no whistle was blown nor bell rung. Smith also failed to hear a whistle or bell. Bowlin was not asked as to what Crockett did in this regard, but Smith stated that he could not say whether Crockett looked for a train or not. Just as they drove up on the tracks, Andy Hatfield was in his Ford car by the side of the railroad, having backed it from a coal tipple north of the crossing to or near the highway. He testified that he saw the train coming and was waiting for it to pass; that as the boys drove up to the track he shouted to them to look out for the train and waved his hand. Smith and Bowlin say they saw Hatfield, and thought he only spoke to them, and some one in the group asked who he was.

About that moment the train and the coupe came together. The automobile was thrown back against the coal car just north of the siding and rebounded into the tender of the engine, which demolished the car and resulted in the death of Crockett and injury to Bowlin. It was a double-header passenger train running at a high rate of speed. There was other evidence introduced in behalf of the appellee, showing that no whistle was blown or bell rung as this train approached the crossing. But it may be said that the evidence of these witnesses is

not only negative in its character, but their location with reference to the crossing makes their testimony of little probative value.

On the other hand, the trainmen testified that the whistle was blown for this crossing 800 or 1,000 feet before reaching it, and that at a point 50 yards south of the crossing the whistle was blown again for a private crossing north of the one in question. Just before this was blown, the bell was started, and continued to ring from that time until the train stopped after the accident. The evidence of the trainmen is corroborated by several disinterested witnesses, who testified positively that the whistle was blown, and some of them that the bell was ringing.

The fireman testified that he was watching the automobile as it drove along the highway, and saw it when it went behind the coal car. He noticed that it had slowed down, and assumed it was stopping for the crossing. Cf. Louisville & N. R. Co. v. Hurst's Adm'r, 220 Ky. 402, 295 S. W. 458. He did not advise the engineer of what he had seen, and no effort was made to stop the train. The car next came into view when it was about 12 feet from the crossing, and he stated that it hit the coal tender. It is shown that the fireman was probably less than 100 yards from the crossing when the car passed out of his vision behind the coal car, and because of its momentum it would have been futile to endeavor to stop the train.

1. The railroad company is insisting that the court committed error in not giving a peremptory instruction in its favor. It is hardly conceivable that these young men could have been unaware of the approach of the train, except that they were oblivious to their surroundings. The coal cars (if there were two) obstructed their vision as they started up the incline for not more than 100 or 200 yards, while the train was shown to have been at least 900 feet long. But in measuring evidence for the purpose of applying the scintilla rule of law, it must be construed as favorable for the plaintiff as is reasonable and all logical inferences drawn therefrom. While the case is a close one, both with respect to negligence of the railroad company and contributory negligence on the part of the deceased and the driver of the car (whose negligence is imputed to him, as is conceded), there was sufficient evidence of probative value conducing to establish a cause of action and to take the case to the jury. See Burdon v. Burdon's Adm'x, 225 Ky. 480, 9 S. W.

(2d) 220. And while the proven present conditions at the crossing were not such that the court can say as a matter of law that it was an extraordinarily dangerous one, there was evidence sufficient to submit to the jury the question, and to permit them, if they found it to be a dangerous crossing, to consider the higher degree of care required of all of the parties.

2. It is further insisted that the judgment should be reversed on the ground that the verdict is palpably against the evidence. On this point we reserve an expression of opinion.

3. Serious complaint is made of the instructions. They follow almost exactly those laid down in Louisville & N. Railroad Co. v. Treanor's Adm'r, 179 Ky. 350, 200 S. W. 634. But it is insisted that those instructions have been criticized and departed from in subsequent cases, particularly Louisville & N. R. R. Co. v. Jameson's Adm'x, 214 Ky. 552, 283 S. W. 1026; Louisville & N. v. Thompson, 217 Ky. 21, 288 S. W. 761; Payne, Agent, v. Barnette's Adm'r, 196 Ky. 489, 244 S. W. 896; Payne, Agent, v. Elkin, 202 Ky. 285, 259 S. W. 349; Louisville & N. v. Adams, 205 Ky. 203, 265 S. W. 623; Chesapeake & O. Railroad Co. v. McCoy's Adm'x, 228 Ky. 752, 16 S. W. (2d) 170.

The Barnette and Adams opinions specifically point out the difference in the facts from the Treanor case and the reason why the giving of the extrahazardous instructions which were given in the Treanor case was not authorized.

The Jameson case was different in the same respect, for there was a mechanical appliance at the crossing, which supplemented the statutory requirements as to warning travelers of the train's approach. There was disapproval of the instruction given because it authorized the jury to find against the railroad company, if they believed it had failed to use additional signals or methods and to take such precautions to warn persons using the crossing as to prevent injury to them. The present instruction in effect advised the jury, if they believed this was an unusually dangerous crossing that then it was the dutyof the railroad company, not only to blow the whistle and ring the bell of the train, but also to use such other means to prevent injury to travelers as was demanded by the exercise of ordinary care, and then authorized the jury under those circumstances to find against the company if it had failed ''to employ

other means of warning of the approach'' of the train—not other means of preventing injury—and ''as a direct result of the negligence, if any, the decedent, Crockett, was killed.''

In the Thompson case the instruction was condemned because it imposed upon the railroad company a duty not charged in the pleadings to have been violated. The applicability of that case is insisted upon here because the petition does not charge the crossing to have been ''unusually dangerous.'' It is alleged that it was ''exceedingly dangerous'' by reason of the way and manner in which it was constructed and maintained, and by an amended petition it was called a ''blind crossing'' with detailed allegations as to the conditions. We regard this as substantially the same thing.

The McCoy case did not involve an unusually dangerous crossing such as existed in the Treanor case as well as this one. We do not find that the Treanor opinion has been departed from under similar conditions.

It is further argued that the instructions were erroneous because they required that if the jury believed the crossing was unusually dangerous to travelers and the defendant knew it, or by the exercise of ordinary care could have known it, then it was the further duty of the company to use additional means to prevent injury to travelers, while the instruction defining the duties of the deceased, provided only that if he knew the crossing to be an unusually dangerous one, it was incumbent upon him to exercise increased care commensurate with the danger. It is insisted that it was error not to follow the words ''knew it'' with the phrase ''or by the exercise of ordinary care on his part he could have known it.'' The instruction is correct, for the traveler is not required to use ordinary care to learn whether or not the crossing is unusually dangerous. He is required to exercise ordinary care only to learn that there is a crossing at the place, and then if he sees or knows that it is an unusually dangerous one, he must exercise the commensurate degree of care to prevent his own injury.

4. The court is called upon to give an interpretation of chapter 114 of the Acts of 1926, which it is claimed changes the long-standing rule in the state as to the ''stop, look and listen'' doctrine. The act provides that where the main tracks of a railroad cross a public highway at grade the State Highway Commission may designate such crossing as unsafe, and ''it shall be

unlawful for the driver of any vehicle to cross such crossing without first bringing such vehicle to a full stop at not less than 10 feet, nor more than 30 feet from the nearest rail of such track or tracks." It further provides that at such crossings the railroad companies shall furnish and the highway commission shall place and maintain signals or signboards with the inscription "Stop—Kentucky Law." A penalty is provided for a violation of the provisions of the act by the driver of any vehicle. Included in the penalty section of the act is the following proviso:

"Provided that the failure to observe the provisions of this act shall in no way change or alter the liability of any railroad or interurban railway in the trial of any civil case brought to recover damages against such railroad or interurban railway for death or injuries to person or property: Provided further, that the provisions of this act shall not apply to grade crossings at which have been constructed and maintained gates, electric warning signals, or other automatic audible signals, or which are protected by watchmen." Section 4.

And section 5 is as follows:

"In the event the clause providing that failure to observe the provisions of this act shall in no way change or alter the liability of any railroad or interurban railroad in the trial of any civil cases brought to recover damages against such railroad or interurban for death or injuries to person or property, shall be declared unconstitutional then the entire act shall be noneffective."

The proviso must be considered as a component part of the penalty prescribed, although negative in character. Perhaps in anticipation of a construction of the act that if there should be a violation of the law, the driver of the car would be guilty of such wrong or negligence as would deprive him of all right of action, it being the uniform judicial decree that a violation of law affects the right of a civil action, the Legislature clearly intended, and positively manifested that intention by the proviso and by section 5 as well, that the offender should not be thus penalized. There can be no question of the power of the Legislature to take away the contributory effect and to provide that a violation of the statute should

not bar or affect a recovery. So that the "Stop, Look and Listen" doctrine has not been modified by this act. It was reiterated in Chesapeake & O. Railway v. Kennard's Adm'r, 222 Ky. 115, 300 S. W. 335, that failure to observe that precaution is not negligence per se, although the act was not referred to nor does it appear whether the accident was before or after its enactment.

It is insisted by the appellant that this provision of the act is unconstitutional because not included within the title. We think that it is comprehended by the title under the clause referring to penalties for noncompliance. If it were invalid the appellant obviously would not be benefited, for the application of section 5 would result in declaring the whole act void.

5. There was, however, a prejudicial error committed by the court in rejecting competent evidence. The appellant sought to prove by Dr. J. D. Adkins that on the day of the accident, or the next morning, Ralph Bowlin, the driver of the car, stated to him that he alone was responsible for the accident; that it was his fault; that he and the other boys were talking and paying no attention to the train. Bowlin was the agent of the deceased, and his responsibility was the deceased's responsibility. There were only two questions for the jury to answer: Was the defendant negligent? Was the deceased or the driver of the car contributorily negligent? If Bowlin was responsible for the accident then no recovery could be had. The case principally rested on his testimony and that of Smith, and having testified to facts exculpating himself it was very material evidence that Bowlin had made contradictory statements. The statement offered to be proved was strong admission against interest and went to the very root of the question.

Dr. Adkins was at the time Bowlin's physician. He was also the local physician for the railroad company. The court refused to admit this evidence (which is shown in an avowal), apparently on the theory that the statements were confidential communications and privileged because made to his physician. In most jurisdictions, communications between physician and patient arising from the professional relation are deemed of such confidential nature that the ends of justice do not demand exposure, and statutes have been enacted excluding them as evidence upon objection. At common law there was no such privilege (28 R. C. L. 532; 40 Cyc. 2381), and

that has not been changed by statute in this state. Subsection 4 of section 606 of the Civil Code of Practice makes privileged all communications to an attorney by a client and to a clergyman or priest when made to him in his professional character, but not a physician and patient. The court considers this evidence to have been competent and its rejection prejudicial, and because of this error the judgment must be reversed and a new trial granted.

This conclusion obviates consideration of other points raised in brief.

Judgment reversed.