## POE v. CHESAPEAKE & O. RY. CO. et al.
### No. 84.

District Court, E. D. Kentucky,
Catlettsburg Division.

Jan. 11, 1946.

John C. Clarke, of Ashland, Ky., for plaintiff.

LeWright Browning, of Ashland, Ky., for defendant.

SWINFORD, District Judge.

This is an action in which the plaintiff seeks to recover damages for the death of his intestate, who was killed by one of the defendant's engines and train of passenger cars in the city of Catlettsburg, Kentucky, at what is known as the Chaffee Street crossing. The case is submitted to the Court on law and facts.

In order to understand the case a clear picture of the physical surroundings of the scene of the accident is important. The City of Ashland, Kentucky, has a population of approximately 30,000 people. Its easternmost limits abut the westernmost limits of the City of Catlettsburg, with a population of approximately 6,000. The easternmost limits of Catlettsburg abut the Big Sandy River, which divides Kentucky and West Virginia. Immediately east of the river is the City of Kenova, West Virginia, immediately east of which is Ceredo and Huntington. · I point out these facts to show that in reality there is one continuous city serving a highly industrialized section with a large population and, although the corporate limits of Catlettsburg may show a relatively small population, in reality it is a part of a densely populated center.

At the scene of the accident there are three railroad tracks which may be identified as they are in the map filed by the defendant marked Stevenson's Exhibit #1, as Tracks 1, 2 and 3. Center Street in the City of Catlettsburg runs parallel to these tracks and is next to Track #3, or the Southernmost track. It should be pointed out that Center Street in Catlettsburg is U. S. Highway 60, which is the main east-west highway coming into Kentucky from West Virginia and points east. This highway at this particular point is comparatively narrow. While the exact dimensions are not given by the record, an examination of the photographs filed as exhibits by both the plaintiff and defendant in this case will show that it is a narrow street. Especially so for the vast amount of traffic which passes over it every 24 hour period. The Court has an intimate knowledge of this street and highway and takes cognizance of the fact that it is much used and carries a very heavy burden of traffic. As indicated by the pictures, there is no sidewalk on the side of the street adjacent to the railroad tracks.

North of the railroad right of way is the Ohio River. Between the tracks and river is a group of about 52 dwelling houses. The residents of these houses patronize the stores, churches, schools, public places, etc., on the south side of the tracks. This group of houses is called the Sandy City section of Catlettsburg. Connecting Sandy City with Center Street and the principal thoroughfares used by the residents are Broadway and Chaffee Street. Broadway is 450 feet west of Chaffee Street.

The plaintiff's decedent, Mary Ann Poe, a girl eight years of age, was visiting in a residence on the north side of the tracks. She had been sent from the house where she was staying to the store on the south side of the tracks to purchase some soap. As she returned she entered Chaffee Street at the intersection with the defendant's right of way and Center Street. There was a freight train moving east on the middle track. She stood within a foot of the south rail of the south track to wait for the freight train to pass. While she was thus waiting a passenger train traveling in a westerly direction struck and killed her.

Just east of Chaffee Street the railroad tracks make a sharp turn to the left. The map, identified as Stevenson's Exhibit #1, while correctly giving the location of the property at the scene of the accident is very deceptive as to the angle of the curve. I do not mean to imply that the engineer has intended to do this and it may be that by scale it would not be any greater than is shown by the map, but certainly from an examination of the photographs in the record and from personal view of the scene, the curve to the east of Chaffee Street is much sharper than one would judge from a perusal of the map only. As railroad curves go, this is an unusually sharp curve.

Counsel for defendant, in his cross-examination of the plaintiff's witness, Bob Meade, referred to this curve as a "pretty sharp curve", and in the direct examination of H. J. Smith, the locomotive engineer, who was the first witness introduced

for the defendant, we find this question and answer:

"Q. Do you know where the crossing is that is involved in this accident, the Chaffee Street Crossing? A. That is right in that stiff curve."

Further on in the examination of this witness, when being questioned as to the speed of the train, he made this statement:

"Yes, sir, before going into that stiff curve on the straight track it was right on 31 miles per hour and I judge wasn't going more than 31 or 32 at the time I crossed the crossing."

And later in the examination:

"Q. Is that what you call a very stiff curve? A. It is."

In view of the fact that the freight train was on the middle or #2 track the curve plays an important part in the determination of the case. The freight train in the curve made it impossible for the engineer to see the child on the crossing from the cab of the engine on the right side and the fireman on the left side being on the outside of the curve had his view of the crossing completely obscured. The freight train also obstructed the view of the child from seeing the approaching passenger train until it had rounded the curve near the crossing and just before it struck her. Had she been looking in that direction she would of course had ample time to have avoided being struck. That, however, is to charge her with contributory negligence. This brings us to the first question of consideration in the case. Can the plea of contributory negligence be sustained?

The child was eight years of age and under the Kentucky authorities is presumed not to be accountable for her conduct. A clear statement of the rule is found in United States Natural Gas Co. v. Hicks, 134 Ky. 12, 119 S.W. 166, 168, 23 L.R.A.,N.S., 249, 135 Am.St.Rep. 407:

"The proof shows, without contradiction, that appellee was only eight years old at the time he received his injuries, an age at which the legal presumption is that he was not accountable for his conduct. He did not realize nor fully appreciate his situation and the probable result which might come to him. The general rule is that, when a child reaches the age of fourteen years, the legal presumption is that it knows right from wrong, and it is responsible for its acts. Between that age and seven years the legal presumption is with

the child, and to make it responsible it must be shown by testimony that it had sufficient intelligence and discretion to realize and to know what would be the result of its acts."

This language is approved in the later case of Louisville & N. R. Co. v. Hutton, 220 Ky. 277, 295 S.W. 175, 53 A.L.R. 1328. See also Sutton Construction Co. v. Lemaster's Administrator, 223 Ky. 296, 3 S. W.2d 613.

Counsel for the defendant in his brief very frankly acknowledges that "because of her youth negligence cannot be imputed to her."

The plaintiff's right of recovery must rest entirely upon the negligence of the defendant, and the record must disclose by a preponderance of the evidence what that negligence was.

The defendant makes the question that there is a fatal variance between the pleadings and the proof. First, because certain trainmen are made parties defendant who were later admitted to not be the operators of the train, while others in charge of the operation of the train at the time were shown by the proof. This objection is of no consequence since recovery must rest largely upon the maintenance of a dangerous crossing. While the speed of the train is a circumstance to be considered it alone would not be sufficient to establish negligence. Since the trainmen could not be charged with the maintenance of the crossing there can be no recovery against them and since there is no recovery against any trainmen misnomer is unimportant.

The further objection that the pleading will not admit of proof of a dangerous crossing is without merit. The petition (since it was filed in the state court is so designated rather than "complaint") charges that the injury occurred through the gross negligence of the defendant company in causing an engine and train to run into, etc., the plaintiff's decedent at the Chaffee Street crossing. The crossing and its physical aspects were known to the defendant and if the crossing is held to be dangerous the defendant is charged with that knowledge. Practically the same question was before the Court of Appeals of Kentucky in Louisville & Nashville R. Co. v. Marshall's Adm'x, 289 Ky. 129, 158 S. W.2d 137, 141. There the court said:

"But our interpretation of the charge made in the petition is that it is broad enough to embrace negligence, if any, in failing to take extraordinary precaution if the crossing was an extraordinarily dangerous one, since it will be observed that the charge in the petition is 'gross negligence and carelessness', not only in the operation of the train, but also that it was guilty of negligence and carelessness in the 'maintenance and controlling of its railroad and trains.'"

It should also be pointed out that while nicety of pleading is commendable the whole purpose of the pleading is to advise the defendant of the facts on which the plaintiff relies for recovery. The defendant could not have been mislead in this instance. Federal Rules of Civil Procedure, rule 8(a), (e)(1), (f), 28 U.S.C.A. following section 723c.

This brings us to the decision of the case on its merits. There is presented the single question of the defendant's negligence.

I conclude that the defendant was negligent in two principal acts and that this negligence was the proximate cause of the death of plaintiff's decedent.

First, the train was being operated at too great a speed under the circumstances of this case. Second, the failure of the defendant to provide adequate safety devices for a dangerous crossing. At the time of the accident there was an ordinance in the City of Catlettsburg limiting the speed of trains to 15 miles an hour. The train was traveling at a rate of from 30 to 45 miles per hour. The engineer testified that he was going about 31 or 32. Other persons estimated the speed as high as 45 miles an hour. Some of the witnesses put it as low as 30 miles an hour. It is reasonable to assume that it was traveling at a rate of approximately thirty-seven or eight miles per hour, or two and one half times the speed limit fixed by the ordinance.

While it is true that courts may not hold the operators of trains to the strict accountability of a low speed ordinance where the tracks are clear of obstruction, and there is no reason why pedestrians cannot see the approach of trains, the pedestrian should not be held to be the insurer of his own safety, which is the result that follows if city ordinances regulating speed of trains are ignored.

This is especially true where the pedestrian is a child of tender years as in this case. The fact that there was a freight train over the crossing traveling in an easterly direction, with the noise attendant to the movement of such trains and the fact that the engineer, according to his own testimony, saw this child in danger, while some distance up the tracks, is a greater reason why the ordinance in this particular instance should have been observed and the failure of its observance constitutes negligence.

The operators of the train state that they sounded warnings by blowing the whistle and that the bell was ringing. They are corroborated in this by disinterested witnesses who, at the time, were on the street or in their residence along the tracks. The child, very evidently could not hear the sound of the whistle and bell on the passenger train that struck her because of the noise made by the freight train which was nearer to her than it was to the witnesses who testified that they heard the whistle.

According to the testimony of the engineer he saw the child at a distance of 150 feet from the crossing. If the train had been traveling at anything approximating the speed limit fixed by the ordinance, that is to say 15–20 miles per hour, he could have stopped the train or slowed it to such a speed that the death of this child could most probably have been avoided. The reasoning of counsel for the defendant to the effect that the seriousness of the times and the importance of railroad traffic justified a speeding up of the trains is a very rational and effective argument. It is one, however, that should address itself more properly to the city counsel or Board of Commissioners of the City of Catlettsburg rather than to the court as a reason for excusable violation of the ordinance. Too frequently courts have ignored or run rough shod over the statutes and ordinances of local law-making bodies and have, in the name of common sense and liberal reasoning, usurped legislative functions. It is not for this court to say that 15 miles per hour through the City of Catlettsburg in this congested area, over a much used public crossing and street, is too great a burden upon the prompt delivery of persons and goods by the railroads or that it was a mill stone about the neck of the war effort.

This question of speed was before the Court of Appeals of Kentucky in the recent case of Kentucky & Indiana Terminal Railroad Co. v. Cantrell, 298 Ky. 743, 184 S.W.2d 111, 116. I quote the pertinent language from the opinion: .

"Appellants' objection to the first instruction is directed at paragraph (c) thereof, which deals with speed. In support of their objection they argue that if the engineer were required to observe the duty imposed by this instruction at every crossing in the City of Louisville and in the country districts, the movement of traffic would be unduly restricted and delayed. In this connection, however, they cite no authority to sustain their position, and virtually concede that they have none.

"The point should be made at once that we are not dealing with crossings generally, but with the crossing mentioned and described in the record, which appellants own evidence and brief show to be an unusual and exceedingly dangerous one. It is the type of crossing which imposes upon the railway company a greater degree of care than it owes at the usual ordinary crossing. In paragraph (a) of this instruction the court told the jury that it was the duty of the engineer to keep a lookout ahead for persons and vehicles. This was correct and proper; it is a duty which is owed at every crossing, and the erection and maintenance of gates or lights does not relieve the railway company of that duty.

"It would not make sense to require a lookout at such a dangerous crossing and at the same time sanction a rate of speed which would render the lookout futile. Under the conditions which prevailed in this case, the jury could well have concluded that any speed which was so great that the train could not be stopped within the 230 feet mentioned in the evidence was an excessive speed and negligent."

And in Louisville & Nashville R. Co. v. Treanor's Administrator, 179 Ky. 337, 200 S.W. 634, 639, the court quotes with approval the following language from Cincinnati, N. O. & T. P. R. Co. v. Champ, 104 S.W. 988, 31 Ky.Law Rep. 1054:

"In the numerous cases involving crossing accidents that have come before this court, the central idea in all of them is that the company must use such care and precautions for the safety of travelers as the character of the crossing makes reasonably necessary for their safety and protection. What this degree of care is must depend upon the facts of each case, and is a question for the jury. At one crossing, ringing the bell and sounding the whistle might be amply sufficient; at another, it would be wholly inadequate, and a flagman or other safety device be necessary. This does not necessarily mean that the speed of trains must be slackened, as no rate of speed at ordinary crossings is usually negligence, but at exceptionally dangerous crossings, if the company does not choose to have a flagman or other safety device, and the statutory signals are not sufficient, the speed of the train must be so regulated as not to unnecessarily imperil the safety of persons using the highway."

The further argument of the counsel that the ordinance was very old and was practically a dead letter, because it had never been enforced, is not sufficient reason for the court to now hold that it was not negligence to operate this train at more than twice the speed limit fixed by the ordinance at a time when a freight train was making inaudible the ringing of the bell and the blowing of the whistle, the conventional signals for crossings, to a small child, which the engineer says he saw standing (not walking across—but standing) in the pathway of a train. Lack of enforcement of an ordinance or statute may be a good argument on a charge of violation, in mitigation of punishment, but it should avail little on the question of negligence involved here. The railroad may have ignored this ordinance and yet when a crossing accident occurs it should not be permitted to say that because it had paid no attention to the ordinance in times past, it should, therefore not be held accountable when it is shown that the speed of the train, coupled with other circumstances, resulted in the death or injury of a pedestrian.

The fact that the freight train was passing over the crossing in the immediate presence of the child is another circumstance which must be considered in determining the question of negligence. The operation of the freight train was, of course, not negligence, but the noise made by it prevented the hearing of the whistle and bell on the passenger train. Since the noise of the defendant's freight train made the warning inaudible to the pedestrian the operators of the defendant's passenger

train should have more closely observed the speed ordinance, as it approached this constantly used crossing.

It has been recognized by the Kentucky courts that the noise made by a passing freight train should be taken into consideration in determining whether or not the signals given and the action taken on the part of the agents of the defendant as they approach the passenger train are sufficient. In Cornett's Adm'r v. Louisville & N. R. Co., 233 Ky. 797, 26 S.W.2d 1031, 1033, the court said: "The deceased undoubtedly did not hear the whistle or bell of the approaching train because of the clang and clatter of the freight train which was at the moment in the act of stopping." In that case the injured party was held not to be guilty of contributory negligence as a matter of law, even though he walked directly into the train, where, by reason of the noise of the freight train, he could not hear the other signals and was entirely oblivious to the oncoming train.

■ The speed of the train must be considered in its relation to the other circumstances in the case as well as its relation to the importance to the public of speedy transportation. Counsel's argument that transportation cannot be hampered is discussed in Given's Adm'r v. Kentucky C. R. Co., 15 S.W. 1057, 12 Ky.Law Rep. 950, 951. In the case of Louisville & N. R. Co. v. McCombs, 54 S.W. 179, 181, 21 Ky.Law Rep. 1232, the court quoted from that opinion the following language with approval:

"An exception to this rule exists, however, where a train is passing through a town or city, and where people are likely to cross the track at any point, and are known to be in the habit of doing so by those operating the train. In such a case, there is constant danger to life, and, out of regard for it, those in charge of a train must look out for persons who may be upon the track, and give such notice of its approach and movements, and so regulate its speed, as is likely to warn them of danger, and enable them to get out of the way. A less rate of speed results, but the protection of human life is paramount to this consideration. The care to be exercised by those in charge of so dangerous a motive power must, in reason, be graduated by the liability to danger."

■ The Kentucky rule governing such cases as the one at bar insofar as the question of speed and care is concerned, is summed up in the following quotation from the opinion in Chicago, St. Louis & New Orleans R. Co. et al. v. Armstrong's Administrator, 168 Ky. 104, 181 S.W. 957, 958:

"This court has uniformly adhered to the doctrine that in places where the presence of persons upon the railroad tracks must be anticipated it is the duty of the railroad company, in the operation of its trains, to keep an effective lookout, maintain a reasonable rate of speed, and have some person in a place where he can control the movement of the train. Louisville & N. R. Co. v. Johnson's Adm'x., 161 Ky. [824], 832, 171 S.W. 847; Cincinnati, N. O. & T. P. R. Co. v. Ackerman, 148 Ky. 435, 146 S.W. 113; Cincinnati, N. O. & T. P. Ry. v. Mullane's Adm'r, 151 Ky. 499, 152 S.W. 555; Louisville & N. R. Co. v. Bays' Adm'r, 142 Ky. 400, 134 S.W. 450, 34 L.R.A.,N.S., 678; Cason's Adm'r v. Covington R., 93 S.W. 19, 29 Ky.Law Rep. 352; Conley's Adm'r v. Cincinnati R., 89 Ky. 402, 12 S.W. 764; Shelby's Adm'r v. Cincinnati R., 85 Ky. 224, 3 S.W. 157; Illinois C. R. Co. v. Murphy's Adm'r, 123 Ky. 787, 97 S.W. 729, 11 L.R.A.,N.S., 352; Louisville & N. R. Co. v. McNary's Adm'r, 128 Ky. [408], 420, 108 S.W. 898, 17 L. R.A.,N.S., 224, 129 Am.St.Rep. 308. The reason for requiring the train, where the presence of persons upon the track must be anticipated, to be operated at a reasonable rate of speed, is to enable the employé on the train, when an individual is discovered in peril, to stop or slacken its speed, so that the person in peril may escape or be saved. A lookout would be useless, if the train was not under a reasonable degree of control, so that it could be stopped in time to save the life of the one in peril."

As I have endeavored to point out the question of speed alone might not be sufficient evidence of negligence to warrant a recovery. It is the speed of the train in a congested area over a known much used or constantly used crossing where the defendant company had notice of the danger to pedestrians and where no safety device was placed after its representatives had been present and had more or less participated in meetings of the city council at the time an ordinance requiring safety devices had been adopted. A concise statement of the rule as it relates to speed is found in Piersall's Adm'r v. Chesapeake & O. R. Co., 180 Ky. 659, 203 S.W. 551, 554:

"The places where the failure to moderate the speed of trains amounts to negligence, are, where trains are operated through the streets of towns and cities and populous communities, and where the density of the population renders it probable that persons will at all times be upon the streets and upon the crossings, and therefore their presence is to be anticipated. There are other places, and, under exceptional circumstances, where the ones operating trains are required to anticipate persons upon the tracks, and at such places and under the special circumstances the speed of the train must be moderated."

That this 12th Street or Chaffee Crossing was a dangerous crossing cannot be doubted. This fact was well known to the defendant. An attempt had been made on the part of the city counsel to have some safety device or protection for the public placed at a number of crossings in the city but particularly at the crossing at which this child was killed. From my personal observation of the crossing and from the record in this case, which contains a number of photographs, maps, and exhibits the approach to the crossing from the east on this south track, because of the curve in the track, obscured the crossing when the middle track to the east of the crossing was occupied by a train of cars.

The ordinance which was adopted on April 3, 1944, provided that the C. & O. Railway Company should install, at certain designated crossings in the city, safety devices of such kind and character as will give sufficient warning of the approach of its trains and engines at the crossings. These devices were to be kept at all grade crossings and were to be installed at the earliest possible date. It further provided that the defendant should use all reasonable diligence and haste and with the least possible delay in complying with the ordinance. For clarity of understanding, I quote the first section of the ordinance:

"Whereas, various citizens of the city of Catlettsburg have called attention to the City Council to the fast speed of railroad trains over the tracks of the Chesapeake and Ohio Railroad over and across street grade crossings endangering the lives of those crossing the railroad tracks at, and in said City, and various persons in the north part of the City, generally known as Sandy City, and residing between the Chesapeake and Ohio track and the Ohio River, have petitioned the Council to take such action as may be necessary to eliminate the extremely dangerous conditions at the Chaffee Crossing and at the 10th Street crossing to get to their homes, schools and churches who constantly use said public streets across the railroad tracks to Center Street, and have petitioned the Council to have installed safety devices at said railroad crossings for their protection and all persons using said streets at said railroad crossings:

"Now therefore, the Board of Council of the City of Catlettsburg, Kentucky, to render said crossings less hazardous, do ordain, that the Chesapeake and Ohio Railway Company operating trains over its tracks at said crossings shall install, and operate at said crossings safety devices of such kind and character as will give sufficient warning of the approach of its trains and engines at said streets at said crossings; and, to further ordain, that such safety devices shall be installed and kept in operation by said railroad company at each and all grade crossings of the Chesapeake and Ohio Railroad tracks within the City of Catlettsburg for the safety and protection of the general public using said streets at said crossings."

At the trial of the case when the plaintiff sought to introduce this ordinance, the attorney of record for the defendant asked the court that he be privileged to give an explanation and, among other things, made the following statement:

"The equipment that goes into those devices, particularly the copper and the electric equipment, have a very high priority, as Your Honor doubtless knows, and we were prohibited from installing devices of that kind or of any kind without first receiving permission of the WPB; so the matter was explained to the Council, and they conceded that it would be impossible to install these devices at all crossings in the City of Catlettsburg. They first picked out this Chaffee crossing then as the one that they desired to protect, and the railway company prepared an application for approval by the WPB to enable it to install this safety device at this particular crossing. Before any action could be taken, however, the Council got into a wrangle with itself and was uncertain as to whether it wanted Broadway or Chaffee Street protected. The matter was not determined but was left up in the air; and some few months prior to the accident the City Council again took the matter up. I speak with

some accuracy, for I took part in all the conferences. At that time an agreement was reached by which certain devices would be installed at certain crossings. That explains the apparent refusal of the railway company to comply with this ordinance. When this accident happened a watchman was installed at this crossing according to the city ordinance. Finally after five or six months the necessary approval was obtained from the War Production Board and the necessary equipment installed."

I have quoted this portion of the record which shows clearly that the company had a definite understanding and appreciation of the importance of complying with the ordinance and of the seriousness of the situation as it existed at this particular place. The delay occasioned by the necessity for securing priority may be thus satisfactorily explained, but while the delay may have been necessary, the company, recognizing, as is shown from this statement of facts, the danger to life at this particular crossing should not have approached it at a high rate of speed when the view of both the engineer and fireman, because of the curve and the freight train, was obscured. In other words, they ran this train blindly, at a high rate of speed, into a crossing which they knew to be a dangerous place in almost constant use by pedestrians and vehicles, which resulted in the death of this child. This constituted negligence for which compensatory damages should be awarded.

This ordinance is attacked and its incompetency in evidence is urged on the ground that it is void and invalid for its indefiniteness and uncertainty. It is urged that because it does not make specific the time in which the railroad company is required to comply with it by installing devices, that it does not meet the requirement of certainty. With this, I cannot agree in the light of the explanation of counsel for the defendant, who states that he was present at the time the ordinance was under discussion and at the time it was passed. According to this explanation, because of the war conditions and the uncertainty of securing materials, it may not have been possible to fix a date for the fulfillment of the ordinance by the defendant company. The court will assume that the members of the City Council of the City of Catlettsburg had no personal knowledge of what kind of materials or what kind of devices would be used. In so far as the record

shows, there was nothing to prevent the company from placing a flagman at these crossings almost immediately, while it was awaiting the War Production Board priority for whatever materials it proposed to use. If, as is asserted by counsel for the defendant, the manpower shortage prevented this, the speed should have been modified until a compliance with the ordinance could be had.

It is explained by the witnesses for the defendant that because of the war and the difficulty of securing materials, that these safety devices had not been installed. This may be a reasonable explanation of why the city ordinance had not been obeyed and may be a reasonable explanation why this dangerous crossing was unguarded at the time that the child was killed, more than four months after the effective date of the ordinance, but it is evidence of the fact that the railroad company was fully advised by the city council, through the ordinance, that it was an extremely dangerous crossing and that the lives of the people of the City of Catlettsburg were in great danger so long as it remained unguarded. This is an additional reason why the other ordinance fixing the speed of the trains should have been reasonably observed.

Notwithstanding this, the condition of the crossing alone may not be sufficient evidence of negligence to justify a recovery. There is, however, coupled to that fact and to be considered with it, the further circumstance that the train was traveling at a rate of speed between 30 and 45 miles per hour. That at the time it approached the crossing, a freight train, traveling in the opposite direction was on the middle track and making noise so that a person standing within 15 feet of it, could not hear the ringing of the bell and the blowing of the whistle on the west bound passenger train, which struck the child. There is further the fact that the engineer, at a distance of 150 feet up the track, saw a small child "standing" in the pathway of a train, waiting to cross the track after the freight train had passed. There is thus presented uncontradicted evidence of a dangerous crossing, a train traveling greatly in excess of the speed limit fixed by the ordinance, knowledge by the operators of the train that their customary signals of ringing the bell and blowing the whistle could not be heard because of the passing freight train in the immediate presence of the pedestrian

and within 15 feet of her, the knowledge of the engineer that a small child, which proof shows to be 8 years of age, was standing in the pathway of the train apparently without knowledge of its approach. We then have these combined circumstances woven into one pattern, which, in my judgment, presents a case in which the court is justified in holding the defendant guilty of negligence and awarding damages for the death of the plaintiff's decedent.

It is true that there were no buildings or permanent obstructions of any kind to prevent the child from seeing the approaching train at a great distance down the tracks, but that is not of itself sufficient to relieve the defendant of the negligence which I have just pointed out. There was, however, the obstruction of the passing freight train. It cannot be disputed that no one would be struck by a train if they did not get on or near the tracks and there have been very few cases in the whole United States where a pedestrian or operator of a vehicle has been struck at a crossing that the accident could not have been avoided had the person who was struck stopped and looked up and down the tracks before venturing on or near them. Such a requirement, however, is not the law in Kentucky and such a requirement would do nothing more than to make the pedestrian the insurer of his own safety and relieve the railroad company operating their trains over highways, crossings, and through towns of all responsibility for their own negligence. It is well said by the Kentucky Court of Appeals in Louisville & N. R. Co. v. McNary's Adm'r, 128 Ky. 408, on page 420, 108 S.W. 898, at page 902, 17 L.R.A.,N.S., 224, 129 Am.St.Rep. 308, that such is not the law. I quote the pertinent language from that opinion:

"The woman manifestly could have seen the train if she had looked in that direction just before she went upon the track, but she had a right to assume that notice of the approach of a train would be given; and where proper signals are not given this court has held in a number of cases that the question whether the traveler used ordinary care is for the jury. Cahill v. Railroad Co., 92 Ky. 345, 18 S.W. 2 [13 Ky. Law Rep. 714]; Louisville & N. R. Co. v. Cooper, 56 S.W. 144, 21 Ky.Law Rep. 1644; Louisville & N. R. Co. v. Lucas' Adm'r, 98 S.W. [308], 309 [30 Ky.Law Rep. 359, 539], and cases cited above."

I have personally visited the scene of this accident on two occasions and have observed the movements of trains under circumstances similar to those described in the proof and am of the opinion that this is an exceptionally dangerous crossing and under the circumstances described on this occasion with the obstruction of the east bound freight train making it impossible for one of even more mature years to see the approach of the west bound train beyond the curve, that it was negligent to approach the curve and crossing at a greater rate of speed than that fixed by the ordinance of the City of Catlettsburg. The case of Cincinnati, N. O. & T. P. R. Co. v. Hare's Adm'x, 297 Ky. 5, 178 S.W. 2d 835, 837, decided on March 10, 1944, in my opinion goes much farther in favor of the railroad companies in cases of this character than is justified by the authorities cited in support of the following rule which it lays down:

"Of course, every railroad crossing is dangerous, but to authorize such an instruction the crossing must be so exceptionally dangerous on account of a natural or habitual artificial obstruction, or of other immediate surroundings, that a jury could say that one exercising ordinary care and prudence in traveling the highway can not see an oncoming train or become aware of its near approach until he is practically in immediate danger and unable by the exercise of ordinary care to avoid being struck by the train. Such a condition, where there is frequent use and travel, imposes the duty upon the Railroad Company to use other or exceptional means to warn and avoid injuring travelers, the character of which depending on what would be reasonably necessary to that end under the facts of each situation."

I cannot believe that our Kentucky Court of Appeals meant to go so far as to make the traveler the insurer of his own safety or to adopt the old Federal rule expressed in New York Cent. & H. R. Co. et al. v. Maidment, 3 Cir., 168 F. 21, 21 L.R.A.,N.S., 794. Such a rule relieves the railroad company of responsibility and in no case could a recovery be had or the railroad company be so negligent as to be held accountable in damages. I have read and re-read this opinion and must assume that the court was prompted by the peculiar circumstances in that particular case. Facts, of course, easily distinguish it from the case at bar.

The traveler in the Hare case was an adult, driving an automobile, and it really turned upon the question of contributory negligence. In the instant case, the deceased was a child 8 years of age and a pedestrian, not capable of contributory negligence.

Since there was no sidewalk on the side of the street next to the railroad tracks she necessarily must leave the street and get onto the railroad property to avoid being struck by vehicles on the street. The very natural thing for her to do, with no trains in sight on Track #3 was to go to the top of the incline which approached the track from the street.

The record shows that the deceased was standing within a foot of the rail nearest to Center Street. An examination of Stevenson's Exhibit #1, which is the map showing the general location of the tracks and Center Street—or U. S. Highway 60—and the photograph, Stevenson's Exhibit #3, shows that Track #3 was only a few feet (approximately 10 or 12) from Highway 60, or Center Street. Stevenson's Exhibit #3 further shows that the approach from the street to the track was a rather steep incline. Thus, the child, in attempting to cross the railroad tracks, would have to stand in the street or near the edge of the street or at the place where she was standing or on the incline. Apparantly she did the only natural thing when she left the street and went up to the top of the incline and stood in the place where she was standing when struck.

It will be noted that the language in the Hare case includes the phrase, "or of other immediate surroundings". Certainly the presence of the freight train would be an immediate surrounding at this crossing which should be in contemplation of the Kentucky Court.

In Louisville & N. R. R. Co. v. Kimble's Adm'x, 140 Ky. 759, 131 S.W. 790, 792, a nine year old child was killed at a crossing in St. Matthews. The Kentucky Appellate Court, speaking through Judge O'Rear, in the opinion gives a comprehensive statement of the crossing case law as applied by the Kentucky courts. It is expressly pointed out that where the crossing is much used and the noises of passing trains are so frequent and alarm signals, such as train bells and whistles and crossing bells are so often heard that the public becomes so accustomed to them that they are diminished in their effectiveness and that other means of notice to prevent accident should be adopted. I quote the following from that opinion:

"The reason bells and whistles are used is because ordinarily they have been found sufficient to give adequate warning. If it had not been so, they would not be so employed. When, however, conditions are such that those means are not adequate, the same reasoning requires the adoption of some other that is adequate. For the object is to give warning. Therefore, the rule is that notwithstanding the statute requires the use of whistle and bell at crossings, if the conditions are exceptionally dangerous, other and additional means must be used. It is not true that if the engineer gives ever so much warning he may then go on and kill people who do not take heed. The presumption is that the instinct of self-preservation can be relied on to impel people in danger to extricate themselves when made aware of the fact. But in every state of case they should first be made aware of the fact before the presumption can be indulged. And it is on this presumption alone that railroad trains run with such speed across highways, along streets, and through more or less populous communities. In cities, speed is reduced, gates are placed at crossings; so are watchmen; the engine bell is ringing continuously; so is the electric bell in addition at some crossings. All these additional precautions are taken and required solely because the opportunities for casualties are multiplied in populous centers in proportion to the numbers using the crossing, and because of the confusion from noises, obstruction of view and other things there that peculiarly distract the attention of the wayfarer. These additional precautions are not out of deference to any exceptional right of the urban population. And when they are required by law it is not because the law regards the safety of that class of greater concern than the safety of any other. Therefore, when the conditions elsewhere approximate those just named, the law requires like precautions for the safety of life and limb."

As pointed out by counsel for the defendant, the many decisions in this state on the dangerous crossing rule are somewhat confusing. This arises, of course, because there are no two cases alike. There is not much difference of opinion on what the rule states, but the difficulty arises

in its application to the different states of facts. I have examined all the cases cited in briefs and many others. While the courts may be said to be more liberal toward the railroads in crossing accident cases in more recent years, I do not feel that any such change has taken place that would deny recovery in this case.

It is singular that two crossing accidents under almost identical facts should occur within a few feet of each other. The case of Chesapeake & O. R. Co. et al. v. Ward's Adm'r, 145 Ky. 733, 141 S.W. 72, presents almost a parallel case to the one at bar. In that case a young girl 15 years of age was killed in Catlettsburg at the Broadway crossing mentioned in this opinion as 450 feet west of the Chaffee Street crossing. The facts are so similar that I quote them in part:

"At the point of the accident the company's road is double-tracked. On the south of these tracks is Center street, but between Center street and the railroad track is the single track of the Ohio Valley Electric Railway Company. The plant of the Wright-Saulsberry Lumber Company is located just north of the railway company's track. The lumber company has a switch track which runs parallel with the railroad track. Broadway street lies in the western part of the city of Catlettsburg, and is located about 300 feet east of the western limits of that city. The next street east of Broadway is Chaffee street, which is about 656 feet distant. Between Broadway and Chaffee streets the railroad tracks curve to the north. Center street is one of the principal streets of Catlettsburg; so is Broadway. Where these streets intersect, the town is thickly populated. Between the railroad tracks and the river, along and adjacent to Broadway street, are a large number of dwelling houses and a church. On the south side of Center street, and of the railroad tracks, is a school house and a number of dwelling houses. The people living in this vicinity must cross the railroad tracks at the Broadway street crossing in order to reach Center street. Those going to Ashland, or up into Catlettsburg, either upon the street car line, or by vehicle or otherwise, must cross the railroad tracks at the Broadway street crossing.

"The decedent, Cloetine Ward, was employed by the Wright-Saulsberry Lumber Company as a stenographer. Their office is located some 40 or 50 feet north of the railroad track. Upon the morning of the accident the decedent left the office of the company about 11 o'clock for the purpose of taking a street car and going to her home for her noonday lunch. After leaving the office, she walked south along Broadway until she reached the railroad tracks. At the time of the accident the crossing in question was blocked by a moving eastbound freight train on the south track. Just before this train had cleared the crossing, the decedent stepped upon the westbound track, and was struck by an Ohio & Big Sandy passenger train approaching from the east. This train was some 20 or 25 minutes late, and was running at the rate of from 30 to 45 miles an hour; the weight of the evidence being that the speed of the train was about 40 miles an hour."

In connection with the argument that the freight train on the track was sufficient warning to pedestrians not to try to cross the track the court said:

"In this connection it is argued that the presence of a passing train was notice of the fact that the crossing was blocked, and that decedent should not therefore have undertaken to cross. We have applied this doctrine where crossing gates were lowered and a party attempted to cross. See Harbeson v. Louisville & Nashville Railroad Co., Ky., 127 S.W. 757. The reason for the rule is that the lowering of the gates is notice of the fact that a train is approaching. That rule, however, has no application to the facts of this case. The presence of a train upon one of two tracks adjoining is no notice of the fact that another train is approaching upon the other track. We can not, therefore, say, as a matter of law that decedent's conduct in stepping upon the track was such as to justify the court in taking the case from the jury."

The other phases dealing with questions in the instant case are discussed by Judge Clay in the Ward case.

In reaching a proper determination of this case, the court should not single out each separate item of negligence on the part of the defendant and thus determine that because none of them, singly, are sufficient to show actionable negligence, that there can be no recovery. It is the "bundle of sticks" story. Separated the various actions of the defendant might not be sufficient to justify a recovery and, like the separated sticks, can be broken. However, when all of the items are taken and com-

bined, the case, like the bundle of sticks cannot be easily destroyed. In other words, it is the combined items that lead me to the conclusion that the defendant was guilty of negligence and that, that negligence was the proximate cause of the death of the plaintiff's decedent. The crossing was a dangerous crossing within the meaning of the law. It was in almost constant use by the trains of the defendant. The approach to the crossing was somewhat upgrade from the street level thereby requiring more attention from a pedestrian or operator of a vehicle who approached the crossing from Center Street, the direction from which the little girl came. There were a number of houses, approximately 50, used as residences, on the north side of the tracks. The stores, business houses, public buildings and schools were on the south side of the tracks. The people living on the north side used this crossing, which was a regular city street, all the time, both day and night, to patronize the places I have named. There is much traffic over the railroad tracks at this point. This condition had existed for many years and was well known to the defendant and those who operated its trains. Coupled with all of these circumstances the train traveling at twice the speed limit approached a dangerous crossing with the engineer's vision obscured by the freight train. While violating two ordinances the defendant struck a child of such tender years that it could not be charged with contributory negligence.

I must therefore conclude that the defendant was negligent and that such negligence caused the death of plaintiff's decedent.

The next question for determination is the amount of damages to be awarded. This question is not without some difficulty. The decedent was a girl eight and one-half years of age. She was normal in every respect and of at least average intelligence. Her expectancy of life, according to Dr. Wigglesworth's table of mortality, was 40.14 years. In fact, under present improvement in health conditions it was much higher. Necessarily there is much speculation as to what amount of damages should be allowed. In times past a woman could not demand much salary or wages. Her earning power was very low. At present and apparently in the future the field of endeavor for women is unlimited. It would serve no good purpose to review the decisions in Kentucky. The child here had no earning capacity at the time. What the future might hold for her as compared with those persons considered in former decisions of the Kentucky courts is problematical. In Chesapeake & O. R. Co. v. Ward's Adm'r, supra, the girl that was killed was fifteen and one half years old. She was earning $25 per month. The court sustained a verdict of $12,500. Miss Ward was killed in 1907.

In Louisville & N. R. Co. v. Kimble's Adm'x, supra, the decedent, a girl nine years of age, was killed in 1908. The court sustained a verdict of $6,000. Judge O'Rear, speaking for the court said in the opinion:

"It is claimed that the verdict was excessive, that the earning capacity of a girl 9 years old is not so susceptible of proof that its value after she might become 21 can be measured, which is to say that, for negligently killing female children there is only a nominal liability. A girl 9 years old has an expectation of living 39 years longer. Her expectancy is hers, not her father's, though her services until she is 21 may belong to him. But the jury do not award compensation for her labor. It is for the destruction of her power to earn money, a power which is hers alone, and, while it may be difficult to prove, is nevertheless of certain and substantial value. We cannot say, (and who could) that $6,000 was too great a value, or even enough. Certain it is, it does not strike us as being so excessive as to indicate passion or prejudice on the part of the jury, or excessive at all."

These cases occurred more than thirty-five years ago. Values have greatly increased. Opportunities for women workers have vastly improved. I feel that to fix the damages at $10,000 in this case is proper.

Findings of facts, conclusions of law and judgment in conformity with this opinion should be prepared and submitted.